THE STATE OF OHIO, APPELLEE, *v.* SKATZES, APPELLANT.

[Cite as *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391.]

(No. 2003–0487—Submitted September 28, 2004—Decided December 8, 2004.)

PFEIFER, J.

{¶ 1} On the afternoon of April 11, 1993, inmates at the Southern Ohio Correctional Facility ("SOCF") at Lucasville rioted and took control of L Section, one of three main prison cell blocks. On or about April 12, inmates killed inmate Earl Elder. On April 15, inmates killed Robert Vallandingham, one of eight corrections officers taken hostage during the riot. On April 21, while inmates were surrendering and releasing the remaining hostages, inmates killed inmate David Sommers. Defendant-appellant, George Skatzes, was found guilty as one of the inmates responsible for the murders of Elder, Vallandingham, and Sommers and was sentenced to death.

{¶ 2} Sometime before April 11, 1993, the Ohio Department of Health mandated that all prison inmates in Ohio's prison system be tested for tuberculosis. The test required an injection. The Muslim inmates at SOCF, led by Carlos "Hasan" Sanders, a leader of the Muslims at SOCF, objected to that form of testing on religious grounds. Word filtered down to the Muslims that a lockdown of SOCF was going to take place on Monday, the day after Easter Sunday, April 12, 1993, to facilitate the tuberculosis testing.

{¶ 3} On the evening before the riot, April 10, high-ranking members of the Aryan Brotherhood, including Jason Robb, Dewey Bocook, and Freddie Snyder, and the Muslims, including Sanders and James Were, met in the L block gym. Upon seeing this gathering, inmate Robert Brookover knew "there was something going on." Robb told fellow Aryan Brotherhood member Roger Snodgrass, "[B]e on [your] toes tomorrow."

{¶ 4} On the afternoon of April 11, inmates took control of the entire L section of the prison, including cell blocks 1 through 8. Prison authorities attempted to end the takeover by negotiating over the phone with representatives of the three dominant gangs. The gangs included the Muslims, led by Sanders, who controlled L6; the Aryans, led by Jason Robb and Skatzes, who controlled L2; and the Black Gangster Disciples, led by Anthony Lavelle, who controlled L1. Inmates controlled access to and from any area of L block.

{¶ 5} Several corrections officers ("C.O.s"), including Robert Vallandingham, who was working in L1 that day, were taken hostage. As the riot unfolded in its early stages, Vallandingham had locked himself in the corrections officers' L1 restroom. Inmates were able to batter open the restroom door and take him hostage. Other inmates saw Sanders and Were escort Vallandingham to L6. Other guards taken hostage were eventually held in L6 as well, except for C.O.s Darrold Clark and Jeff Ratcliff, who were confined for most of the riot in L2.

{¶ 6} During the initial stages of the riot, inmates stormed to the back stairwell of L2 where C.O. Ratcliff and inmate Earl Elder had locked themselves. Using a weight bar, inmates punched holes in the wall next to the L2 stairwell door. Ratcliff came out of the stairwell and was beaten. Inmates then brought Elder out of the stairwell and began beating him with baseball bats and stabbing him with shanks. Robb was heard telling Elder, "You want to be police, we will show you what it is to be police." Elder was then locked in a cell in L6.

{¶ 7} Later that night, Lucky Roper, a Muslim inmate, met with Skatzes in the gym. Skatzes then went to Snodgrass and told him, "We got to go to L6." At L6, Skatzes told Snodgrass: "I want you to take this guy out." Then Skatzes, Roper, and Snodgrass went to the cell where Elder was being held, and Skatzes told Snodgrass, "Go ahead and take care of your business, son." Snodgrass went into the cell and stabbed Elder numerous times. When Snodgrass came out of the cell, Skatzes put his arm around him and said, "You did a good job, brother, I am proud of you." Elder's body was placed in the recreation yard at 10:15 the next morning. He died from multiple stab wounds in his chest and head, as well as skull fractures.

{¶ 8} On April 12, prison authorities turned off the electricity and water in L block. Skatzes shouted from a window with a bullhorn, demanding that the authorities turn the power back on. He also had C.O.-hostage Ratcliff identify himself using the bullhorn and demand that power be restored inside L block.

{¶ 9} Within two or three days of the takeover, FBI technicians had placed microphones in the tunnels underneath L block to record inmate conversations. By the end of the riot, 591 "tunnel tapes" had been recorded.

{¶ 10} The inmate leaders negotiated over the phone with prison authorities. Inmate David Sommers controlled the phones and tape-recorded the inmate leaders during their negotiations with prison authorities. During the first half of the riot, Skatzes was one of the lead inmate negotiators. He told the prison negotiators to stop tear-gassing K block, which they were doing to quell a disturbance, or they were "going to cost an officer's life." As he continued to argue with authorities over the phone, Skatzes declared, "[Y]ou just cost an officer's life." At that time, however, the inmates had not killed a guard.

{¶ 11} At another time during the siege, Skatzes and Robb ordered a crew of inmates to make a hole in a back wall of L7. They planned to kill a C.O. and dangle his body out of the back of L7, where it could be seen from the front of the SOCF by members of the media. In addition, Skatzes instructed inmates guarding the C.O. hostages to kill them if authorities came into L block.

{¶ 12} On April 14, the inmate leaders met in L2 to discuss a solution to the stalemate on their demands. In addition to the gang leaders, including Skatzes, other inmates within the three gangs also attended the meeting. According to Lavelle, a vote was taken to kill a guard if their demands were not met. "No one spoke against doing it, so it was agreed it would happen."

{¶ 13} Later that evening on April 14, inmate Miles Hogan overheard a conversation between Skatzes, Sanders, and inmate Stanley Cummings. They talked about the fact that someone who was supposed to kill a C.O. had backed out. Skatzes blurted out: "Fuck the CO, I will kill the CO or fuckin' COs."

{¶ 14} Another inmate-leader meeting took place on the morning of April 15. At that time, Skatzes got on the phone and demanded that prison authorities restore water and power within L block or "there would be a guaranteed murder." He added, "Do your thing. 10:30 or a dead man's out there." He said that if the water and power were not turned back on by 10:30, "the hardliners were going to step in and take over." At the inmate meeting of leaders, a vote was taken to kill a C.O., and a member from each inmate gang was chosen to participate in the killing. According to witnesses at the meeting, Skatzes agreed with the decision to kill a C.O.

{¶ 15} The deadline set by Skatzes passed without the water or power being restored. Officer Vallandingham was killed in L6 by Muslim inmates. Several masked inmates carried Vallandingham's body out of L6 and down the L corridor to the gym. Skatzes walked behind those who carried the body. At 11:10 a.m., Vallandingham's body was placed in the recreation yard. The coroner later concluded that Vallandingham had died by ligature strangulation.

{¶ 16} Negotiations resumed that afternoon, and the inmate leaders agreed to release a C.O. in exchange for allowing Skatzes to make a live radio broadcast to air the concerns and demands of the inmates. The broadcast took place that evening at 7:30 p.m. in the recreation yard. After the broadcast, C.O. Darrold Clark was released. Although he had a transcript, Skatzes's performance was described as "rambling." Many inmates were not pleased, and Sanders told Robb that he wanted him to make all future decisions on behalf of the Aryans. Skatzes's role as an inmate negotiator diminished thereafter.

{¶ 17} The following day, April 16, prison officials agreed to allow inmate Cummings to broadcast inmate grievances on television, in exchange for the

release of another C.O. At 1:35 p.m., C.O. Tony Demons was released while Cummings delivered his live television address.

{¶ 18} The takeover continued because Sanders and Robb reportedly wanted to break the record for the longest prison takeover in the United States. Finally, on April 20 and 21, Sanders, Robb, and Lavelle met with attorney Niki Schwartz to discuss ending the takeover. They reached an agreement, and the inmates began to surrender on April 21.

{¶ 19} Meanwhile, during a meeting in L2 between Robb, Lavelle, and Sanders, the gang leaders decided that inmate David Sommers, who controlled the phones and ran the inmates' tape player throughout the negotiations "had to die, he knew too much." Sommers had a reputation as a snitch before the riot. Robert Brookover also had a reputation as a snitch, but he was given a choice: kill someone or be killed. Brookover asked Skatzes if he was going to be killed. Skatzes replied, "[J]ust take care of business, be cool."

{¶ 20} The surrender was held up for a period of time because, as Skatzes, Robb, Sanders, and Cummings told Lavelle, they had "some things [they had] to take care of." An inmate called "Kinky" gave Brookover baker's clothes (kitchen whites, which Brookover put on), a shank, and an extension cord. Skatzes, Snodgrass, and Bocook also changed into different clothes. When Robb arrived, the group went to L7 across the corridor from L2. Bocook instructed Brookover to retrieve baseball bats out of a guitar case in the back of L7. When they arrived in L7, no one was there. Bocook screamed, "Where's that bitch Sommers at." Robb left to get Sommers from L2 and, moments later, Sommers was seen chasing Robb into L7. Brookover tackled Sommers and stabbed him. Skatzes ran up and kicked Sommers in the head. Brookover followed orders to choke Sommers with the extension cord, and then Skatzes struck Sommers in the head with a baseball bat at least three times. Brookover and the others beat and stabbed Sommers until he was dead. Then the killers cleaned themselves, burned their clothes, and surrendered to authorities.

{¶ 21} Prison authorities found Sommers's body in L7. The coroner attributed death to a massive blow to the head leading to skull fracture, laceration of the skull, and other severe brain injuries and bleeding.

{¶ 22} The Scioto County Grand Jury indicted Skatzes on six counts of aggravated murder, two counts each for the murders of Vallandingham, Elder, and Sommers. Each murder count carried four death specifications: murder in a detention facility [R.C. 2929.04(A)(4)], a prior aggravated murder conviction [R.C. 2929.04(A)(5)], murder as a course of conduct [R.C. 2929.04(A)(5)], and murder during a kidnapping [R.C. 2929.04(A)(7)]. Skatzes was also indicted on three counts of kidnapping [R.C. 2905.01].

{¶ 23} The trial court changed venue to Montgomery County, and the case was tried before a jury. After the state presented its case, the defense called five witnesses, including former hostage C.O. Ratcliff. Skatzes testified in his own behalf. The defense claimed that Skatzes had been a peacemaker during the prison takeover and had opposed killing a C.O. Skatzes denied involvement in the Elder and Sommers murders. The jury found Skatzes guilty on all counts and specifications. After a mitigation hearing, the jury recommended death for the murders of Elder and Sommers and a life sentence for the murder of Vallandingham. The trial judge sentenced Skatzes accordingly.

{¶ 24} In January 2003, the court of appeals affirmed Skatzes's convictions and death sentence but vacated his conviction for the kidnapping of Elder at the state's request. The cause is now before the court upon an appeal as of right.

{¶ 25} Appellant Skatzes has raised 60 propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's convictions or his death sentence. We have also independently weighed the aggravating circumstances against the evidence presented in mitigation and have reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's convictions and death sentence.

## PRETRIAL/VOIR DIRE ISSUES

### Alleged Flaws in the Indictment

{¶ 26} In his first five propositions of law, Skatzes argues that each count in the indictment and each death-penalty/kidnapping specification was defective because the indictment failed to demonstrate on its face the basis for indicting him, and the indictment or specification failed to provide notice of the allegations against him. Skatzes failed to object to the form of the indictment before trial as required by Crim.R. 12(B)(2), however, and thus has waived all but plain error. *State v. Frazier* (1995), 73 Ohio St.3d 323, 332, 652 N.E.2d 1000. In any event, the indictments tracked the language of the definition of kidnapping in R.C. 2905.01(A) and, therefore, properly charged the offenses. *State v. Murphy* (1992), 65 Ohio St.3d 554, 583, 605 N.E.2d 884; *State v. Landrum* (1990), 53 Ohio St.3d 107, 119, 559 N.E.2d 710; Crim.R. 7(B). In addition, Skatzes obtained a bill of particulars that provided him with the information he sought and identified aggravated riot as the felony underlying the R.C. 2905.01(A)(2) kidnapping charges. *Murphy,* 65 Ohio St.3d at 583, 605 N.E.2d 884. Skatzes acknowledged at his arraignment that he understood the charges and waived the reading of the indictment.

{¶ 27} In proposition of law I, Skatzes alleges that the indictment was insufficient to charge aggravated murder involving a kidnapping because it failed to name or identify the kidnapping victims, failed to inform him of the facts and

elements of the charge of kidnapping he faced, and failed to identify the applicable Revised Code section of the kidnapping charges. To the contrary, the indictments for kidnapping tracked the language of R.C. 2905.01(A) and properly charged the offenses. The bill of particulars also provided Skatzes with the information he sought. Plain error is lacking. We reject proposition of law I.

{¶ 28} In proposition of law II, Skatzes essentially repeats the same argument raised in proposition of law I but directs it toward the kidnapping-based death-penalty specifications. Again, Skatzes does not demonstrate plain error. The indictment tracked the statutory language, and the bill of particulars eliminated any confusion Skatzes may have had about the charges. We reject proposition of law II.

{¶ 29} In proposition of law III, Skatzes contends that the indictment was insufficient in naming four of the five purposes of the kidnapping statute [R.C. 2905.01(A)(1), (2), (3) and (5) ] in the disjunctive. Skatzes further asserts that the indictment failed to identify the felony underlying the kidnapping-offense alternatives charged under R.C. 2905.01(A)(2) and failed to demonstrate the basis of the grand jury findings. As noted by the court of appeals, it was apparent that the prosecution intended to show that Skatzes had engaged in kidnapping for all of the stated statutory purposes rather than just one of them. Use of the word "or" in the indictment was not vague, since the alleged purposes listed were not mutually exclusive. In addition, the bill of particulars identified aggravated riot as the felony underlying the R.C. 2905.01(A)(2) kidnapping charge.

{¶ 30} Moreover, Skatzes's reliance on *State v. Childs* (2000), 88 Ohio St.3d 194, 724 N.E.2d 781, is misplaced. In *Childs,* we held that an indictment's failure to allege an overt act in furtherance of an alleged conspiracy was a fatal defect. Here, the omission of the underlying felony in the indictment was remedied because the bill of particulars identified the underlying felony, as is permitted where the indictment sufficiently tracked the wording of the kidnapping statute. *Murphy,* 65 Ohio St.3d at 583, 605 N.E.2d 884. In addition, there is no requirement that the indictment demonstrate the basis for the grand jury's findings. The bill of particulars serves this function. We reject proposition of law III.

{¶ 31} In proposition of law IV, Skatzes contends that the indictment was defective because it failed to identify the underlying felony in the kidnapping charge or the elements of the underlying felony. As discussed under proposition of law III, however, the indictment tracked the language of the kidnapping statute. The bill of particulars identified aggravated riot as the underlying felony and remedied any defect in the indictment. *Murphy,* 65 Ohio St.3d at 583, 605 N.E.2d 884. Skatzes's claim regarding the failure to list the elements of aggravated riot was not outcome-determinative plain error since Skatzes was

sufficiently informed of the charges against him in both the indictment and bill of particulars. *State v. Frazier,* 73 Ohio St.3d at 332, 652 N.E.2d 1000. We reject proposition of law IV.

{¶ 32} Finally, in proposition of law V, Skatzes contends that even though Ohio law does not require complicity or conspiracy to be charged in the indictment in every instance, the failure to charge complicity or conspiracy in his case means that the indictment failed to give notice of the charges. Skatzes again fails to demonstrate plain error. A charge of complicity may be stated in terms of the principal offense. R.C. 2923.03(F). See *State v. Dotson* (1987), 35 Ohio App.3d 135, 520 N.E.2d 240, paragraph two of the syllabus. Skatzes was on notice that evidence could be presented that he was a principal offender or complicit in the aggravated murders. The indictment and bill of particulars put Skatzes on notice of the charges he faced. We reject proposition of law V.

## Prejudicial Joinder

{¶ 33} In proposition of law XV, Skatzes contends that the trial court erred in denying his motion to sever the charges against him. Skatzes asserts that joinder was prejudicial because the offenses were separate in time, method, and degree of involvement by Skatzes. "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293. Crim.R. 8(A) also allows joinder of two or more offenses that "are based on the same act or transactions * * * connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 425, 613 N.E.2d 212. An appellate court will reverse a trial court's denial of severance only if the trial court has abused its discretion. *Lott,* 51 Ohio St.3d at 163, 555 N.E.2d 293.

{¶ 34} The trial court did not abuse its discretion in denying Skatzes's motion to sever. First, the charged offenses committed by Skatzes were part of a common scheme to gain concessions from prison authorities for inmate demands and to silence inmate snitches. Crim.R. 8(A). Second, even if Skatzes had been tried separately for his charged offenses, the state would still have been able to introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B). Third, the evidence of each crime joined at trial was "simple and direct," so that proof of the separate offenses could be readily separated. *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 50–51. Thus, Skatzes was not prejudiced by joinder of offenses. See *Lott,* 51 Ohio St.3d at 163, 555 N.E.2d 293. We reject proposition of law XV.

### Limits on Voir Dire

{¶ 35} In proposition of law XVI, Skatzes contends that the trial court unfairly denied him the right to explore juror attitudes on specific mitigating factors. Skatzes also alleges that the trial court erred in denying his challenge for cause of a prospective juror who expressed unwillingness to consider specific items of mitigation evidence.

{¶ 36} The trial court acted within its discretion in disallowing specific questions to individual prospective jurors on specific mitigating factors. See *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304. *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, does not require judges to allow individual voir dire on separate mitigating factors. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292. A review of the entire voir dire indicates that the detailed questioning that occurred over a ten-day period was adequate to expose faults that would render a juror ineligible. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.

{¶ 37} The court did not abuse its discretion in denying Skatzes's challenge for cause on prospective juror Hicks. Although Hicks stated initially that the gravity of the offenses might prevent her from considering life sentences, she specifically agreed to follow the court's instructions, even if it involved evidence she hypothetically might be skeptical of considering. We reject proposition of law XVI.

### Adequacy of Counsel

{¶ 38} In proposition of law XXXVI, Skatzes asserts that the trial court failed to conduct an adequate inquiry when he requested substitute counsel. The record indicates, however, that Skatzes never requested substitute counsel. Although Skatzes sent a letter to the trial judge addressing some specific problems and concerns about being able to review some audiotapes and other evidence, that letter is not part of the record. Nevertheless, the trial court asked both parties about the allegations in the letter and the status of discovery. The trial judge assured Skatzes that he would have the opportunity to review all the tapes. When asked by the trial judge whether he wanted to fire counsel, Skatzes denied that he was requesting that counsel be removed from the case or substituted. Skatzes opined that he and defense counsel could "iron this thing out." We reject proposition of law XXXVI.

### Death Qualification of Jury

{¶ 39} In proposition of law XLVI, Skatzes contends that death qualification of jurors violated his right to a fair and impartial jury. Death qualification of jurors during voir dire has been upheld by both the United States Supreme Court and

this court. See, e.g., *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137; *State v. Moore* (1998), 81 Ohio St.3d 22, 26, 689 N.E.2d 1. We summarily reject proposition of law XLVI.

### Failure to Record Grand Jury Proceedings

{¶ 40} In proposition of law LIII, Skatzes argues that he was prejudiced by the state's failure to record grand jury proceedings, contrary to *State v. Grewell* (1989), 45 Ohio St.3d 4, 543 N.E.2d 93, syllabus. Skatzes asserts that he was denied the opportunity "to support his case at trial upon the showing of a particularized need" for the grand jury testimony.

{¶ 41} "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, syllabus, citing *State v. Patterson* (1971), 28 Ohio St.2d 181, 57 O.O.2d 422, 277 N.E.2d 201, paragraph three of the syllabus. The trial court, in its discretion, determines whether the defendant has shown a particularized need for the production of grand jury proceedings. *Greer* at 148, 20 O.O.3d 157, 420 N.E.2d 982. Skatzes filed a motion for disclosure of exculpatory and impeaching information and included a request that the state identify "each occasion on which any witness has testified before any court, grand jury or other tribunal or body." At a pretrial hearing, the defense stated that it was looking for inconsistencies in the testimony of any witness from one occasion to another. The state responded that no live witnesses had appeared before the grand jury and that the defense had received summaries and transcripts of videotaped depositions that had been played before the grand jury. Defense counsel then conceded that the state's response disposed of the motion, and the trial court opined that the issue was therefore moot.

{¶ 42} Nothing in the record substantiates Skatzes's claim that grand jury proceedings were not recorded. Moreover, defense counsel not only failed to demonstrate any particularized need for the grand jury transcripts, they conceded before trial that the state's response disposed of his motion for the grand jury transcripts. We reject proposition of law LIII.

### Discovery

{¶ 43} In proposition of law LVII, Skatzes contends that the state failed to provide the defense with timely and complete discovery. Specifically, Skatzes asserts that the state failed to produce "[a]ll statements and evidence inconsistent with the State's theory of guilt" from the State Highway Patrol's 1,395 interviews conducted in connection with his case. Crim.R. 16(B), however, "does not

authorize the discovery or inspection * * * of the statements made by witnesses or prospective witnesses to state agents." Crim.R. 16(B)(2).

{¶ 44} The highway patrol's 1,395 interviews following the riot constituted statements made by witnesses or prospective witnesses to state agents and were not discoverable unless they were favorable to Skatzes. See Crim.R. 16(B)(1)(f). Skatzes asserts that the state used a computer program to help sort information it obtained from these interviews and that it discarded any information considered "false" because that information would be inconsistent with its theory of the case. Skatzes provides no evidence to support this assertion; we will not presume that the state withheld exculpatory evidence from Skatzes.

{¶ 45} Skatzes next contends that not all of the 591 tunnel tapes or 17 negotiation tapes were turned over to the defense. Yet, at a pretrial hearing at the outset of voir dire, defense counsel acknowledged that it had received all of the tunnel tapes as well as copies and transcripts of the negotiation tapes.

{¶ 46} Skatzes also argues that the state failed to produce plea agreements of inmates whose statements were admitted pursuant to Evid.R. 801(D)(2)(e) as co-conspirator testimony, but who did not testify at Skatzes's trial. In *Giglio v. United States* (1972), 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, the case Skatzes cites as support, the government failed to disclose an alleged promise of leniency made to its key witness in return for his testimony. Id. at 154, 92 S.Ct. 763, 31 L.Ed.2d 104. The statements of Skatzes's co-conspirators are not "witnesses" as that term is normally defined. Thus, Skatzes has no basis to claim that the state was compelled to produce the plea agreements of inmates whose statements were admitted under Evid. R. 801(D)(2)(e).

{¶ 47} Skatzes further claims that not all scientific evidence regarding the time of Vallandingham's death was turned over to the defense and that the missing evidence would have shown that Vallandingham died long before the meeting in which Skatzes allegedly voted to kill a guard. This claim involves the coroner's testimony about a vitreous-eye-fluid test that led the coroner to opine that Vallandingham could have died as early as 6:00 a.m. on April 15, 1993. The coroner also testified that the test produced nothing "inconsistent with him having been killed around 10:30 on the morning of the 15th." Nothing in the record supports Skatzes's claim that he did not receive these test results. Neither does the record suggest that Vallandingham died "long before" the meeting in which inmate gang leaders decided to kill a guard. Finally, Skatzes did not object to the coroner's testimony that Vallandingham died at 7:00 a.m. on April 15, plus or minus one hour, based on the results of the vitreous-fluid test. Even assuming Skatzes did not receive this test, he was not prejudiced because the coroner testified that the time of death could have been 10:30 a.m.

{¶ 48} Skatzes also asserts that not all audio- and videotapes were turned over to the defense. Skatzes does not explain or suggest what tapes should have been turned over but were not.

{¶ 49} Based on all the foregoing, we reject proposition of law LVII.

## TRIAL ISSUES

### *Jury Instructions*

{¶ 50} In propositions of law VI through XIII, Skatzes contends that he was prejudiced by several jury instructions at the close of the trial phase.

{¶ 51} In propositions of law VI and VII, Skatzes argues that the trial court improperly failed to instruct the jury to reach a unanimous decision on the following three issues: whether disorderly conduct was committed, which section of the aggravated riot statute was violated, and which of the statutorily enumerated purposes was the basis of each kidnapping charge.

{¶ 52} Skatzes's failure to object to the instructions waives all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Plain error "should be applied with utmost caution and should be invoked only to prevent a clear miscarriage of justice." Id. at 14, 3 OBR 360, 444 N.E.2d 1332. Plain error exists only where it is clear that the verdict would have been otherwise but for the error. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Plain error is not present in this case.

{¶ 53} With regard to Skatzes's complaint about the failure to instruct on which purpose was the basis of each kidnapping charge, Skatzes essentially argues that his right to a unanimous verdict includes a right to a unanimous theory of culpable conduct supporting that verdict. The United States Supreme Court rejected a similar argument in *Schad v. Arizona* (1991), 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555. In *Schad,* the defendant was convicted of first-degree murder after the prosecution advanced theories of premeditated murder and felony murder. The jury was not instructed to unanimously find defendant guilty based on one of the proposed theories of guilt. The *Schad* court found that different mental states of moral and practical equivalence (premeditated and felony murder) may serve as alternative means to satisfy the mens rea element for the single offense of murder, without infringing upon the constitutional rights of the defendant. Id. at 643, 111 S.Ct. 2491, 115 L.Ed.2d 555.

{¶ 54} The *Schad* court noted: "We have never suggested that in returning general verdicts in [cases proposing multiple theories] the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, 'different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general

requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' " Id. at 631–632, 111 S.Ct. 2491, 115 L.Ed.2d 555, quoting *McKoy v. N. Carolina* (1990), 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (Blackmun, J., concurring).

{¶ 55} The court of appeals in the instant case stated that the five purposes listed in the kidnapping statute [R.C. 2905.01(A) ] "reflect notions of equivalent blameworthiness or culpability" that justify treating them as alternative means to satisfy the mental element of a single offense. *State v. Avery* (1998), 126 Ohio App.3d 36, 48, 709 N.E.2d 875, citing *Schad,* 501 U.S. at 643–644, 111 S.Ct. 2491, 115 L.Ed.2d 555. In our view, the reasoning of *Avery* is logical and follows the reasoning of *Schad v. Arizona.* Therefore, we hold that because all the jurors in Skatzes's case agreed on the verdict, they were not required to unanimously agree upon any one purpose for Vallandingham's kidnapping. The trial court did not commit plain error in failing to give such an instruction. See *State v. Bell* (1996), 112 Ohio App.3d 473, 482–483, 679 N.E.2d 44; see, also, *State v. Evans* (Aug. 18, 1993), Hamilton App. Nos. C–910443 and C–910515, 1993 WL 311681.

{¶ 56} For the same reason, plain error is absent in the trial court's failure to require unanimity from the jury on either of the two definitions of aggravated riot on which the jury was instructed. The trial court's instruction on aggravated riot properly set forth that disorderly conduct was an element of that offense. We reject propositions of law VI and VII.

{¶ 57} In propositions of law VIII and IX, Skatzes contends that the trial court's instructions on complicity and conspiracy were inadequate. Again, Skatzes's failure to object to either instruction waived all but plain error. *Underwood,* 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 58} In proposition of law VIII, Skatzes asserts that the complicity instruction was flawed in that the charge was unclear as to whether the culpable mental state required was for murder or kidnapping. The court charged the jury, "Before you can find the defendant guilty, you must find beyond a reasonable doubt that * * * the defendant, acting with the required culpable mental state for the particular offense, * * * conspired with another to commit the offenses." Plain error is not evident. The language used by the trial court tracked the language of the complicity statute [R.C. 2923.04(A) ] and is not ambiguous. Given the clarity of the instruction, jurors would have understood this instruction to mean that they should apply the culpable mental state for the offense that they found to be the object of the conspiracy.

{¶ 59} Here, and in proposition of law IX, Skatzes asserts that the court's instruction on conspiracy was error. The trial transcript indicates that the court stated, "You may not find * * * that the defendant conspired with others to commit an offense unless you find beyond a reasonable doubt that a substantial

overt act in furtherance of such conspiracy is proved to have been done by him or by a person with whom he conspires, and that such an act *wasn't* performed subsequent to the defendant's entrance into the conspiracy." (Emphasis added.) This instruction is plainly illogical. On its face, it required the jury to find Skatzes culpable only if his overt actions in furtherance of the conspiracy actually occurred before his involvement in the conspiracy.

{¶ 60} The record, however, contains copies of the written instructions provided to the jury during deliberations, and these written instructions correctly stated the law, using "was" instead of "wasn't." In addition, the trial court directed the jurors not to take notes during its charge because they would have a copy of the instructions in the jury room during deliberations.

{¶ 61} Even assuming that the court misstated the instruction, we find that any such error did not affect the outcome of Skatzes's trial. Not only did the written instructions correctly state the law on conspiracy, the trial court encouraged the jury to rely upon the written instructions during deliberations. Moreover, given the jury's detection of a conflict between "a" and "the" in the jury instruction and verdict form discussed in proposition of law XIII, infra, the jury likely would have noticed a conflict in logic between the oral and written instructions and would have requested a clarification had they been confused. No outcome-determinative error occurred. We reject propositions of law VIII and IX.

{¶ 62} In proposition of law X, Skatzes argues that the instruction on other-acts evidence failed to adequately inform the jury as to what acts are deemed "other acts" of the defendant and what evidence is deemed to be evidence of other acts. He also claims that testimony on other acts from "inmate snitches" is "always highly suspect."

{¶ 63} Skatzes's failure to object to the instruction waived all but plain error. *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. In fact, no error occurred. The instruction given tracked the language of Evid.R. 404(B), and the trial court prefaced the instruction with language that accomplice testimony may involve special motives and that jurors should "use it with great caution and view it with grave suspicion."

{¶ 64} Skatzes suggests that the trial court should have enumerated for the jury the other acts presented by the evidence and the evidence in support of those acts. Trial courts are not required, however, to characterize evidence or to instruct juries as to the category into which certain evidence fits. Moreover, Skatzes's proposal appears to require that the trial court usurp the jury's function as the finder of fact. We reject proposition of law X.

{¶ 65} In proposition of law XI, Skatzes complains about the court's reasonable-doubt instruction based on the statutory language of R.C. 2901.05(D). We have repeatedly rejected the same argument. See *State v. Jenkins* (1984), 15

Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300.

{¶ 66} In proposition of law XII, Skatzes raises a number of other alleged errors in the trial-phase jury instructions and asserts that these errors, both individually and cumulatively, warrant a reversal. Skatzes's failure to object to any of the claimed instructional errors waived all but plain error. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. We find no plain error in any of the 12 instructional errors raised by Skatzes.

{¶ 67} Skatzes first contends that the kidnapping instruction was inadequate and failed to identify the underlying felony in the Clark and Elder kidnappings. Trial courts were not required to identify the underlying felony. See 4 Ohio Jury Instructions (2001) 148, Section 501.01(A)(2), applicable to offenses committed before July 1, 1996.

{¶ 68} Skatzes contends that the complicity instruction contained a misleading definition of the crime of soliciting another to commit an offense because it diminished the character of the request required. Yet, the language of the instruction does not support his contention: "Solicit means to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear." We also note that the instruction is taken from 4 Ohio Jury Instructions (2001) 573, Section 523.03(6), applicable to offenses committed before July 1, 1996. No plain error is evident.

{¶ 69} Skatzes contends that the instruction on "purposely" was inadequate. The instruction stated that "[t]o do an act purposely is to do it intentionally and not accidentally." It is difficult to discern how this language would have left the jurors to simply presume, as Skatzes suggests, that anything more than an accident fit the definition of "purposely." Moreover, the court also instructed the jury that "[a] person acts purposely when it is his specific intention to cause a certain result," and that "[p]urpose and intent mean the same thing." These instructions were not erroneous.

{¶ 70} Skatzes next claims error in the instructions defining aggravated riot and disorderly conduct and asserts that the term "felony" was never defined. Skatzes asserts that the jury may have presumed that it knew what conduct constituted a felony and may have convicted him on the basis of nonfelonious behavior. This argument is purely speculative. The trial court identified aggravated riot as an underlying felony to kidnapping.

{¶ 71} Skatzes asserts that the instruction on prior calculation and design allowed the jury to convict on the basis of a lesser degree of guilt than is required for prior calculation and design because the instruction did not include language that the "process of reasoning" must be in "advance of the homicide."

{¶ 72} The trial court instructed the jury as follows: "A person acts with prior calculation and design when, by engaging in a distinct process of reasoning, he forms a purpose to kill and plans the method he intends to use to cause death. The circumstances surrounding a homicide must show a scheme designed to carry out the calculated decision or cause the death.

{¶ 73} "No definite period of time must elapse and no particular amount of consideration must be given, but acting upon the spur of the moment or after momentary consideration of the purpose to cause a death is not sufficient."

{¶ 74} This instruction was adequate and did not constitute plain error. A clear reading of the instruction indicates that the "distinct process of reasoning" must take place before the murder because the phrase "plans the method he intends to use" contemplates future action.

{¶ 75} Skatzes next argues that the instruction on "cause" was confusing and misleading. We upheld the same instruction in *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 230–231, 744 N.E.2d 163. Moreover, the jury was also charged on specific intent to kill.

{¶ 76} Skatzes contends that the court's charge on the kidnapping specifications to the Vallandingham murder counts failed to identify the kidnapping victim. Given the context of the overall charge, it was clear that the victim of the kidnapping was also Vallandingham. See *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. No plain error occurred.

{¶ 77} Skatzes argues that the charge on "unanimity" was deficient because it did not tell jurors that they had to be unanimous on each element of each crime. The court's instruction that the jury "must unanimously agree that the defendant is guilty of a particular criminal offense before returning a verdict of guilty on that offense" was adequate and, in any event, did not amount to plain error.

{¶ 78} Skatzes asserts that the trial court erred in defining "principal offender" as "one who has hands-on involvement in a homicide." This court has held that "principal offender" means "actual killer," *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, or "one who personally performs every act constituting the offense" of aggravated murder, *State v. Getsy* (1998), 84 Ohio St.3d 180, 197, 702 N.E.2d 866, or "one who directly caused the death." *State v. Stallings* (2000), 89 Ohio St.3d 280, 292, 731 N.E.2d 159. The court of appeals agreed with Skatzes that "hands-on involvement" was not specific enough but held that it did not constitute plain error. We agree. The instruction pertained only to the Sommers murder. Skatzes claimed that he was not present for Sommers's murder and first learned of it after the riot when he was in Mansfield. The state's evidence, however, established that Skatzes was an active participant in the Sommers murder. The error in the instruction was harmless because the

evidence at trial showed that Skatzes was an actual killer of Sommers. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 559–560, 709 N.E.2d 1166.

{¶ 79} Skatzes contends that the instructions regarding the verdict forms at the conclusion of the jury charge were "too little too late" in instructing the jury to be unanimous as to any alternative presented during jury instructions. The trial court, however, specifically instructed the jury, "Before you can find the defendant guilty of an offense providing alternatives, you must be unanimous in your verdict as to any alternative." Moreover, all of the verdict forms signed by the jury were unanimous. Given the voluminous number of verdict forms involved, the court did not commit plain error in failing to give the same instruction on every verdict form it reviewed with the jury.

{¶ 80} Skatzes asserts that the cumulative effect of the foregoing instructional errors deprived him of a fair trial. None of the claimed instructional errors have merit, and the one that was erroneous was harmless. We reject proposition of law XII.

{¶ 81} In proposition of law XIII, Skatzes asserts that the trial court, over defense objection, erroneously instructed the jury in response to a jury question. On the second day of trial-phase deliberations, the jury sent the following question to the court (as read into the record by the trial judge): "Count 5, Specification 3, difference in words. Instructions say A, underline A, principal offender. Specifications for signature says the, underline the, principal offender." The court responded, "The principal offender on the verdict forms should read a principal offender * * *." Skatzes contends that the instruction was erroneous because R.C. 2929.04(A)(7) states "the principal offender" with regard to the specification. We have stated that "principal offender" means the "actual" killer and not the "sole" offender. As there can be more than one actual killer, there can be more than one principal offender. *State v. Stojetz* (1999), 84 Ohio St.3d 452, 458–459, 705 N.E.2d 329; *State v. Keene* (1998), 81 Ohio St.3d 646, 655, 693 N.E.2d 246. The trial court did not err in instructing the jury as it did. We reject proposition of law XIII.

### Statements of Co-Conspirators

{¶ 82} In proposition of law XIV, Skatzes argues that the trial court erred in allowing inmate Snodgrass to testify that the Aryan Brotherhood had agreed with the Muslims regarding the treatment of white inmates during the riot. Snodgrass was not certain that it was Skatzes from whom he had heard about the alleged agreement.

{¶ 83} Snodgrass testified that he had killed inmate Elder under orders from Skatzes and that Muslim inmate Lucky Roper had talked with Skatzes in the gym prior to the Elder murder and had watched the Elder killing along with

Skatzes. When the prosecutor asked Snodgrass why he and Skatzes had been involved in this murder with a Muslim, Snodgrass replied that, according to Jason Robb, the Aryan Brotherhood had made a pact with the Muslims. Snodgrass stated that Skatzes had explained the pact to him: "[N]o more white guys were going to be killed in that riot, without sanctions from the AB, * * * that if the [white guys] were to be killed, they were goin' to be killed by their own kind or at least given that opportunity." Snodgrass then equivocated and said he might have heard this from Robb or another Aryan leader.

{¶ 84} Skatzes claims that this testimony about the pact was inadmissible. The testimony was not inadmissible under Evid.R. 404(B), because the testimony did not refer to any prior crime, wrong, or act. If the statement was made by Skatzes, the testimony was admissible under Evid.R. 801(D)(2)(a) as an admission or statement. If the statement was not made by Skatzes, but instead by Robb or another Aryan leader, as Snodgrass conceded was possible, then the statement was admissible under Evid.R. 801(D)(2)(e), as a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy. We reject proposition of law XIV.

{¶ 85} In proposition of law XXXIII, Skatzes argues that the trial court erred in admitting, in violation of Evid.R. 404(B), improper other-acts testimony by Snodgrass of an uncharged plot to kill several inmates at the end of the riot. According to Snodgrass, near the end of the riot, he and other Aryans had learned that some inmates were planning a coup to kill Skatzes and take over negotiations to end the riot. Those inmates involved in the alleged coup were locked in a cell in the Muslim block. When the Aryans tried to obtain the inmates from the Muslims in order to kill them, the Muslims told the Aryans they would not release the inmates because they had converted to Islam. That group of Aryans then decided to kill Sommers.

{¶ 86} The testimony provided the context in which Sommers was murdered. When Skatzes and other Aryans were thwarted in their plans to kill the inmates who planned the coup, they focused their attention on Sommers. The trial court could have reasonably determined that the plot to kill other inmates was not separate from the murder of Sommers, but part of the same series of events. The testimony was not improper other-acts testimony. We reject proposition of law XXXIII.

*Hearsay*

{¶ 87} In proposition of law XVII, Skatzes contends that the trial court allowed inadmissible hearsay, over defense objection, when Snodgrass testified concerning a letter he had received from inmate David Snow, a member of the Aryans. Snodgrass testified that Snow wrote in the letter that inmate Brookover was "a maggot" and "a snitch" who had brought down the Aryans somehow in a murder

case in Arizona. Skatzes argues that Snow's letter was irrelevant and his objection should have been sustained. We agree. Nevertheless, Skatzes was not prejudiced. Accordingly, the error was harmless. We reject proposition of law XVII.

{¶ 88} In proposition of law XVIII, Skatzes asserts that the court erred when it overruled his objection to hearsay testimony from inmate Kenneth Hazlett. Hazlett testified that another inmate, Bobby Bass, had told Hazlett that he had been forced to carry out bodies during the riot, including the body of C.O. Vallandingham. The state contends that Bass was a forced participant in the conspiracy and that his statement was admissible as that of a co-conspirator under Evid.R. 801(D)(2)(e). The court of appeals rejected this argument but found the statement to be harmless. We agree. Bass's statement did not implicate Skatzes, and there is no dispute that bodies were carried out of L block and onto the recreation yard during the riot. Skatzes was not prejudiced. We reject proposition of law XVIII.

### Defendant's Prior Conviction

{¶ 89} In proposition of law XIX, Skatzes notes that the trial court granted his motion to have the court, rather than the jury, determine the existence of his prior-murder-conviction specification. Skatzes contends that he was prejudiced because the prosecutor, over defense objection, cross-examined Skatzes about his prior murder conviction during his testimony and referred to the conviction, without objection, during mitigation-phase closing argument.

{¶ 90} Under R.C. 2929.022(A), Skatzes elected to have the trial judge determine his prior-conviction specification under R.C. 2929.04(A)(5). In *State v. Davis* (1988), 38 Ohio St.3d 361, 364, 528 N.E.2d 925, we observed that when an R.C. 2929.022(A) election is made, evidence concerning a prior murder conviction not otherwise admissible may not be introduced during the trial phase to prove an aggravating circumstance. We further noted, however, that the statute does not "provide a defendant with a blanket statutory right to preclude * * * the introduction of all evidence pertaining to prior purposeful killings which is otherwise admissible." Id.

{¶ 91} During cross-examination of Skatzes, the prosecutor asked him: "[G]oing back to your homicide conviction, someone snitched on you in that homicide * * *, did they not?" The question arose while the prosecutor questioned Skatzes about his attitude toward snitches. Skatzes admitted that the key witness against him in the prior homicide conviction was a person who claimed to be his "partner" in the crime.

{¶ 92} The court of appeals determined that Skatzes's feelings about snitches, and specifically the fact that a snitch's testimony led to his prior conviction, were

relevant to his motive because the state's theory of the case was that Sommers and Elder had been killed for being snitches. The court of appeals found that R.C. 2929.022(A) does not preclude the introduction of the evidence because evidence of other crimes is admissible to show motive pursuant to Evid.R. 404(B). See *State v. Davis*, 38 Ohio St.3d at 364, 528 N.E.2d 925. The rationale of the court of appeals is sound. We conclude that the state's brief inquiry during cross-examination concerning Skatzes's prior conviction was not improper. Moreover, the defense opened the door to the prosecutor's inquiry when it asked Skatzes during direct examination whether he had been "convicted of aggravated murder and kidnapping."

{¶ 93} We also reject Skatzes's claim that it was improper for the prosecutor to briefly mention his prior conviction during mitigation-phase closing argument. When the prosecutor made this reference, Skatzes had already been found guilty and convicted of the prior-murder-conviction specification by the jury. In *State v. Evans* (1992), 63 Ohio St.3d 231, 239, 586 N.E.2d 1042, we found that reference to a prior murder conviction during mitigation closing argument was not error "because the prior murder conviction is an aggravating circumstance." We reject proposition of law XIX.

### Scope of Cross–Examination

{¶ 94} In proposition of law XX, Skatzes argues that the trial court erred when it prevented defense counsel from impeaching inmate Brookover with specific bad acts during cross-examination. Brookover testified that he had killed only two people in his life. Skatzes contends that he was merely attempting to prove that this was a false statement, Evid.R. 608(B), and that he was not trying to prove with extrinsic evidence other homicides committed by Brookover. Skatzes made a proffer of documents, which the defense claims would have shown that Brookover killed one other person. These documents were sealed at a December 8, 1994 hearing by the trial court but were apparently lost and are not part of the record on appeal.

{¶ 95} Evid.R. 608(B) provides that whether specific instances of bad conduct of a witness can be questioned during cross-examination is within the discretion of the court. *State v. Kamel* (1984), 12 Ohio St.3d 306, 310–311, 12 OBR 378, 466 N.E.2d 860. Evid.R. 608(B) also provides that the privilege against self-incrimination overrides the rule. Thus, Brookover could not be required to admit to any other homicide. With regard to the lost documents, the court of appeals correctly held that Evid.R. 608(B) would have precluded the introduction of general information on Brookover's character. The record demonstrates that Brookover's prior convictions, as well as his criminal activities in Arizona prisons dealing with drugs, were the subject of extensive cross-examination. We reject proposition of law XX.

## Expert Testimony

{¶ 96} In proposition of law XXI, Skatzes contends that the trial court erred in allowing Sgt. Howard Hudson of the Highway Patrol to testify about "Stockholm syndrome." Skatzes objected several times during Hudson's testimony. Each time, the trial court overruled his objection. Skatzes submits that the state was required to qualify Hudson as an expert on Stockholm syndrome in order to make such testimony admissible under Evid.R. 702 and that it failed to do so.

{¶ 97} Sgt. Hudson assisted the Department of Corrections' negotiating team during the riot because he had training in negotiations during hostage situations. Hudson explained the numerous difficulties one encounters in dealing with multiple negotiators in a hostage negotiation. Hudson further testified that the state negotiators in the SOCF riot took Stockholm syndrome into account at several points during the negotiations. Hudson's specialized knowledge of and training in hostage negotiations and Stockholm syndrome establish that he had knowledge of a matter not possessed by the average layperson. Accordingly, he was qualified to testify as an expert on these matters under Evid.R. 702, even though the court did not formally qualify Hudson as an expert on the subject. See *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 98} Moreover, Hudson's testimony was not hearsay because it did not convey a statement made by another, nor was it offered to prove that the C.O.s who were held hostage suffered from Stockholm syndrome. Hudson's testimony was offered to explain the state's actions in its negotiations with the inmates. Testimony offered to explain the investigative activities of witnesses, and not offered to prove the truth of the matters asserted, is admissible. *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 400 N.E.2d 401. We reject proposition of law XXI.

## Witness Speculation Testimony

{¶ 99} In proposition of law XXII, Skatzes argues that inmate Lavelle was permitted to speculate, over objection, as to what was said on an audiotape played to the jury. In proposition of law XXIII, Skatzes contends that Lavelle was permitted to speculate, over defense objection, on Skatzes's state of mind with regard to another audiotape. In the first instance, the audiotape was tunnel tape 61, a recording of an April 15 meeting of inmate gang leaders, including Lavelle, where a vote was taken to kill a guard. In the second instance, the audiotape, tunnel tape 67, contained a conversation about negotiations and Skatzes's commitment to the inmates' demands.

{¶ 100} Lavelle was present at both of the recorded conversations and possessed firsthand knowledge of what was said. He was competent to testify regarding inaudible portions of the tapes and the meaning he attributed to

statements made by the other inmates heard on the tapes. Lavelle's opinion testimony in both instances was admissible under Evid.R. 701 because his opinions as to both tapes were rationally based on his memory and perception and were helpful to the determination of a fact in issue. In both instances, Skatzes had full opportunity to cross-examine Lavelle as to what was said or meant on the tapes. Lavelle's interpretation of what was stated in both tapes was based on his personal knowledge and perceptions of the conversations in both tapes. We reject propositions of law XXII and XXIII. See *State v. Robb* (2000), 88 Ohio St.3d 59, 72, 723 N.E.2d 1019.

### Admissibility of Co–Conspirator Testimony

{¶ 101} In propositions of law XXIV, XXV, XXVI, and XXVII, Skatzes challenges the admissibility of statements made by co-conspirators in the takeover of the SOCF.

{¶ 102} In proposition of law XXIV, Skatzes asserts that the state failed to make a prima facie showing of a conspiracy by independent proof, as required by Evid.R. 801(D)(2)(e), and failed to make findings that a conspiracy existed or that Skatzes was a part of it. As a result, Skatzes contends that the co-conspirator statements were inadmissible and deprived him of a fair trial. Evid.R. 801(D)(2)(e) provides that a statement is not hearsay if it was made by a co-conspirator during and in furtherance of the conspiracy. Statements of co-conspirators are not admissible under Evid.R. 801(D)(2)(e), however, until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof. *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus; see, also, *State v. Lindsey* (2000), 87 Ohio St.3d 479, 481, 721 N.E.2d 995. There is no requirement that explicit findings be made on the record. *Robb,* 88 Ohio St.3d at 70, 723 N.E.2d 1019.

{¶ 103} As in *Robb,* supra, at 69–70, 723 N.E.2d 1019, the prosecution established at trial that the entire Lucasville siege involved a major conspiracy by inmate factions. The first three witnesses who testified on behalf of the state, Steven Macko, an inmate, Sgt. Hudson of the Highway Patrol, and C.O. Darrold Clark, established the conspiracy. Macko testified about the takeover of L block, the kidnapping of Vallandingham, the relative strength of the inmate gangs, the gangs' cooperation during the riot, and the identities of the gang leaders. Hudson provided details about the prison factions and their leaders and the tunnel taping conducted during the takeover. He also testified about the events that took place during the takeover, including the compiling of demands by the inmate gangs and their use of prison C.O.s as bargaining chips with the prison authorities. Clark, who was held hostage during the riot, testified about how the

gangs cooperated in the handling of the hostages. This testimony provided the required prima facie showing of the conspiracy.

{¶ 104} Compelling evidence, independent of co-conspirator hearsay statements, established that inmate leaders conspired to take control of L block at SOCF, held hostages, threatened to kill a hostage, and later killed a hostage. We reject proposition of law XXIV.

{¶ 105} In proposition of law XXV, Skatzes contends that co-conspirator testimony is inadmissible when conspiracy is not charged as an independent crime in the indictment. We rejected this argument in *Robb*, 88 Ohio St.3d at 68, 723 N.E.2d 1019: "Although the substantive offense of conspiracy was not charged, the state could prove a conspiracy in order to introduce out-of-court statements by conspirators in accordance with Evid.R. 801(D)(2)(e)." We reject proposition of law XXV.

{¶ 106} In proposition of law XXVI, Skatzes argues that in order for co-conspirator statements to be admitted pursuant to Evid.R. 801(D)(2)(e), the conspiracy must be a crime. Skatzes correctly asserts that Ohio law does not recognize the crime of conspiracy to commit aggravated riot under R.C. 2923.01. That fact does not render co-conspirator statements inadmissible. In *Robb*, no criminal conspiracy was charged, and we upheld the admissibility of co-conspirator statements under similar facts. *Robb*, 88 Ohio St.3d at 68, 723 N.E.2d 1019. Moreover, the state presented ample prima facie evidence of a conspiracy to commit kidnapping and murder, which are recognized as conspiracy crimes under R.C. 2923.01. Even if we were to find error in the state's reliance on aggravated riot as the underlying conspiracy, that error would be harmless in view of the prima facie evidence of conspiracy to commit kidnapping and murder. We reject proposition of law XXVI.

{¶ 107} In proposition of law XXVII, Skatzes argues, pursuant to Evid.R. 403(A), that the probative value of co-conspirator statements offered against him was substantially outweighed by the risks of prejudice and confusion. The admission or exclusion of relevant evidence is within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Just as in *Robb*, the trial court here did not abuse its discretion in admitting relevant, prejudicial co-conspirator evidence against Skatzes. *Robb*, 88 Ohio St.3d 59, 723 N.E.2d 1019. See *Jenkins*, 15 Ohio St.3d at 222, 15 OBR 311, 473 N.E.2d 264. Moreover, "Evid.R. 403 speaks in terms of unfair prejudice. Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid.R. 403 prohibits." *State v. Wright* (1990), 48 Ohio St.3d 5, 8, 548 N.E.2d 923. The relevant co-conspirator statements were not unfairly prejudicial to Skatzes. We reject proposition of law XXVII.

*Other–Acts Evidence*

{¶ 108} In proposition of law XXVIII, Skatzes contends that the state's introduction of evidence of other acts he had committed violated Evid.R. 404(B) and R.C. 2945.59. Skatzes's failure to object to the other-acts testimony waives any error on appeal. *State v. Bays* (1999), 87 Ohio St.3d 15, 26–27, 716 N.E.2d 1126. Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 109} Most of the evidence Skatzes cites involved uncharged acts during the riot, such as destroying property, disciplining inmates by violence, and involvement in the Aryan Brotherhood. Evidence of Skatzes's involvement in the Aryan Brotherhood was offered to show his leadership role during the takeover, which bore directly upon the crimes with which he was charged. Compare *State v. Sanders* (2001), 92 Ohio St.3d 245, 256–257, 750 N.E.2d 90 (evidence of bad acts by other inmates admissible to show defendant's leadership role).

{¶ 110} Evidence about Skatzes's involvement in a hunger strike and stopping up toilets at Mansfield Correctional Institution after the takeover had ended should have been excluded under Evid.R. 404(B). Nevertheless, evidence on these relatively minor incidents did not prejudice Skatzes and was harmless. See *Robb*, 88 Ohio St.3d at 69, 723 N.E.2d 1019; *State v. Gumm* (1995), 73 Ohio St.3d 413, 426, 653 N.E.2d 253. We reject proposition of law XXVIII.

{¶ 111} In proposition of law XXIX, Skatzes complains that the trial court admitted testimony of bad acts by other inmates in the riot. Skatzes asserts that such evidence should have been excluded under Evid.R. 403 and 404(B). Skatzes lists a number of acts committed by others that he claims should not have been admitted through a conspiracy theory.

{¶ 112} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Arguments similar to those raised by Skatzes were raised and rejected in *Robb*, 88 Ohio St.3d at 68–69, 723 N.E.2d 1019, and in *Sanders*, 92 Ohio St.3d at 256–257, 750 N.E.2d 90. The evidence in this case helped prove that prison gang leaders, including Skatzes, conspired over 11 days to seize and control L-complex, settle old scores, engage in assaults, take hostages, and commit murders.

{¶ 113} The prosecutor was entitled to present evidence about the context of the alleged crimes to make the actions of the participants understandable to the jurors. Skatzes did not commit his crimes in a vacuum, and the prosecution was not required to proceed as if he had. The trial court, as in *Robb*, had wide

latitude to permit evidence as to how the riot began and unfolded, the rules and procedures established by the gangs during the riot, how infractions were dealt with, and the ways in which the relationships between the gangs and their members affected the events that occurred.

{¶ 114} This information was relevant to the offenses that Skatzes committed, the biases of the various witnesses, and the reasons that they behaved the way they did. Given the prison-inmate culture and the gang loyalty demonstrated by gang members, much of this testimony would not be within the knowledge or experience of the average juror. The trial court could have reasonably concluded that the probative value of this evidence outweighed the danger of unfair prejudice or confusion of issues. The evidence was relevant and thus was admissible under Evid.R. 403. We reject proposition of law XXIX.

{¶ 115} In proposition of law LI, Skatzes complains that inmate Macko was permitted to testify, over objection, that in order to earn tattoos of lightning bolts, a member of the Aryan Brotherhood had to kill a black person. Skatzes contends that this testimony should have been disallowed under Evid.R. 403. Macko, an L block inmate not affiliated with any prison gang, testified about the symbols of the Aryan Brotherhood and what they are supposed to represent. Macko did not know whether Skatzes had any such lightning-bolt tattoos, and he did not necessarily believe that those who did had killed a black person. Macko also testified that C.O. Ratcliff had such a tattoo and was reputed to have demonstrated racial preferences toward white inmates. Macko's testimony did not directly implicate Skatzes or materially prejudice him. We overrule proposition of law LI.

### Crime–Scene Photos

{¶ 116} In proposition of law XXXI, Skatzes argues that the 275 crime-scene photos admitted during trial had no probative value as to the crimes charged and were prejudicial and inflammatory. Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 473 N.E.2d 768. Relevant, nonrepetitive photos in capital cases, even if gruesome, are admissible as long as the probative value of each one outweighs the danger of material prejudice to the accused. Id. at paragraph seven of the syllabus.

{¶ 117} The crime-scene photographs were introduced during Sgt. Hudson's testimony and depicted the condition of L–block in the aftermath of the takeover. The photos were probative of the inmates' activities during the takeover and of security measures they had taken to prevent authorities from storming L-block or tear-gassing the inmates. Photos depicted the areas where inmates battered holes in the walls to capture prison guards and to take control of areas of L–block, random destruction of property, and bloody areas where violence had

taken place during the siege. Other photos showed graffiti depicting gang activity and a large array of homemade weapons. Skatzes did not object to the admission of any crime-scene photos, and defense counsel specifically stated he had no objection to their admission. Any error is waived except plain error.

{¶ 118} The photos were used to present background information about what occurred in L block during the takeover, including the manner in which prison guards had been captured. They helped establish the existence of gang activity and the presence of weapons. They also illustrated the testimony of Sgt. Hudson, who was part of the negotiation team and who had knowledge of many inmate activities during the takeover. It was not plain error for the trial court to admit the 275 crime-scene photos. See *State v. Wickline* (1990), 50 Ohio St.3d 114, 119–120, 552 N.E.2d 913. We reject proposition of law XXXI.

### Impartiality of Trial Judge

{¶ 119} In proposition of law XXXII, Skatzes claims he was denied a fair trial by a judge who was not impartial. It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 34; see *Rose v. Clark* (1986), 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460.

{¶ 120} Skatzes asserts that the trial judge failed to treat the case independently because he frequently ruled in accordance with how similar matters were previously ruled upon in *Robb*. Skatzes's case was very similar to Jason Robb's case; both were alleged to be leaders of the Aryan Brotherhood during the Lucasville takeover and many of the same witnesses were called to testify in both trials. Given the similarities, it was inevitable that the same legal and evidentiary issues would arise and be disposed of on the same basis in both cases. The fact that the prosecutor and trial judge acknowledged this on the record does not mean that the judge was not impartial.

{¶ 121} Skatzes complains that the judge overruled defense objections but sustained state objections. Skatzes cites two instances to support his claim. In neither instance did the judge abuse his discretion in his rulings. The record indicates that the trial judge overruled prosecution objections when appropriate. No evidence of bias is apparent on the record.

{¶ 122} Skatzes contends that the trial judge showed bias by failing to reprimand the prosecutor for making a threat. The prosecutor stated that if the defense was allowed to comb through the disciplinary records of inmates testifying on behalf of the state, he would do the same for defense witnesses. This statement was more informative than threatening; no reprimand from the trial judge was warranted.

{¶ 123} Skatzes criticizes the trial judge for failing to sua sponte order a competency evaluation. Skatzes argues that his competence was questionable because he characterized himself as "paranoid," was known by the nickname "Crazy George," and demonstrated his incompetence when he testified and could not remember events during the riot. None of these claims were directly related to Skatzes's ability to understand the nature of the proceedings against him and to assist in his own defense. See R.C. 2945.37(A); *State v. Carter* (2000), 89 Ohio St.3d 593, 603, 734 N.E.2d 345. The factors Skatzes cites do not necessitate a competency evaluation.

{¶ 124} Finally, Skatzes asserts that the trial judge failed to control the proceedings by not properly preserving the record or exhibits for appellate review. The problems involving the record will be explored more fully under proposition of law LIV. In any event, the trial judge did not appear to play any role in the disappearance of exhibits from the record, and no bias is apparent.

{¶ 125} We reject proposition of law XXXII.

### Evidentiary Issues

{¶ 126} In proposition of law XXXIV, Skatzes argues that the trial court erred in admitting State Exhibits 289 and 290, poster-size chronologies prepared and displayed by the prosecution to aid the testimony of Sgt. Hudson. The posters showed a time-line and highlighted events during the 11–day takeover, such as when the food drops occurred, when the water and power to L–block were turned off, and when certain inmate demands were made. The posters also included notations about the telephone negotiations and the tunnel tapes.

{¶ 127} Although Skatzes did not object to their introduction as exhibits, he objected to their admission into evidence for the jury to review. He claimed that some of the facts set forth in the chronology were inaccurate and disputed the identity of voices on the tunnel tapes. The trial court considered the arguments of the parties and then overruled Skatzes's objection. The court acknowledged that in a "normal case," he would probably sustain defense objections and not admit the posters. He specifically invoked the discretion of the court and stated that "in a very long, very complicated case," he would allow the jury to use the posters as a reminder of the actual testimony and evidence on that particular subject.

{¶ 128} The admission of trial exhibits is within the sound discretion of the trial court. See, e.g., *State v. Barker* (1978), 53 Ohio St.2d 135, 146, 7 O.O.3d 213, 372 N.E.2d 1324. The court carefully considered the arguments of both sides and decided to admit the exhibits, given the complex nature of the case. The jury was aware that some facts were in dispute, including some of the information on the posters, such as the identity of inmate negotiators on the audio tapes. On

balance, the court determined that the posters would be helpful to the jury and that that factor outweighed any prejudice to Skatzes. The court did not abuse its discretion in admitting these exhibits into evidence. See *Jenkins,* 15 Ohio St.3d at 222, 15 OBR 311, 473 N.E.2d 264. We reject proposition of law XXXIV.

{¶ 129} In proposition of law XXXV, Skatzes alleges error in the trial court's admission of State Exhibit 334, a document purporting to be the by-laws of the Aryan Brotherhood. He contends that the state did not lay a proper foundation for the document and, therefore, that the document was hearsay. Skatzes also alleges that the government shifted the burden of proof to him to show that he had no knowledge of the by-laws.

{¶ 130} Inmate Snodgrass testified that the by-laws were written by inmate Tramp Johnson and given to inmate Bocook, who then gave them to Snodgrass after the takeover. Among other things, the by-laws defined a "traitor" as one who abandoned a "Brother in the middle of a conflict or potentially violent conflict" and that failure of a member to promptly heed a "Call to Arms" would be considered a "traitorous act." Snodgrass stated that being "deemed a traitor" meant you would be killed. Snodgrass also stated that the by-laws were in effect during the takeover.

{¶ 131} Snodgrass properly identified the by-laws pursuant to Evid.R. 901(B)(1), and his testimony was sufficient to support a finding that the document was what he claimed it to be. Snodgrass also testified that all Aryan Brotherhood members had to learn about and accept the by-laws as part of becoming a member. This testimony supported the inference that Skatzes knew about the by-laws at the time of the riot, and it did not unfairly shift the burden of proof to him to disprove his knowledge of them.

{¶ 132} Moreover, the by-laws were not hearsay under Evid.R. 801(B) because the document containing the by-laws was not offered for the truth of the matter asserted. *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 58–60. "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." *United States v. Bellomo* (C.A.2, 1999), 176 F.3d 580, 586, citing *United States v. Stratton* (C.A.2, 1985), 779 F.2d 820, 830. We reject propositions of law XXXIV and XXXV.

### Sufficiency and Manifest Weight of Evidence

{¶ 133} In propositions of law XXXVIII and XXXIX, Skatzes argues that his convictions for the aggravated murder and kidnapping of Earl Elder and Robert Vallandingham were based on insufficient evidence and were against the weight of the evidence, respectively. In proposition of law XL, Skatzes asserts that his conviction for the murder of David Sommers was based on insufficient evidence

and was against the weight of evidence. In proposition XLI, Skatzes contends that his conviction for the kidnapping of Darrold Clark was based on insufficient evidence and was against the weight of the evidence.

{¶ 134} Pursuant to R.C. 2953.02, this court can overturn a conviction as being against the manifest weight of the evidence in a capital case, but only where the crime was committed after January 1, 1995. *State v. Sanders* (2001), 92 Ohio St.3d 245, 254, 750 N.E.2d 90. Because the crimes committed here occurred before 1995, we will not decide Skatzes's weight-of-the-evidence arguments. As in *Sanders,* we will consider these arguments as addressing the sufficiency of the evidence. Id.

{¶ 135} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 136} With regard to the murder and kidnapping of Earl Elder, the state's evidence showed that during the initial stages of the takeover, C.O. Jeffrey Ratcliff and inmate Elder fled to the locked rear stairwell in L2. Inmates retrieved Ratcliff and Elder from the stairwell and then beat them. Elder was thereafter locked in a cell in L6.

{¶ 137} Inmate Snodgrass testified that on the first night of the takeover, after a meeting with Muslim inmate Lucky Roper, Skatzes told Snodgrass, "We got to go to L6." At L6, Skatzes told Snodgrass, "I want you to take this guy out," which Snodgrass understood to mean that he was to kill someone. When Skatzes, Snodgrass and Roper arrived at Elder's cell, Skatzes told Snodgrass, "Go ahead and take care of business, son." After Snodgrass stabbed Elder a number of times, he left the cell. Skatzes put his arm around Snodgrass and told him, "You did a good job, brother, I am proud of you."

{¶ 138} Snodgrass explained that he acted on Skatzes's orders because he believed that he would have been killed if he disobeyed an order from the Aryan Brotherhood. Aryan by-laws were introduced in support of this claim. Roper later told Snodgrass that Elder was not dead. When Snodgrass told Skatzes what Roper had said, Skatzes told Snodgrass that he would "take care of it." Inmate Tim Williams corroborated most of Snodgrass's testimony.

{¶ 139} This evidence was sufficient to support Skatzes's convictions for the kidnapping and aggravated murder of Elder. We reject proposition of law XXXVIII.

{¶ 140} With regard to the kidnapping and aggravated murder of Vallandingham, the state's evidence showed that on April 14, inmate gang leaders, including Skatzes, voted to kill a guard. That evening, Skatzes complained to Muslim gang leaders that whoever was supposed to kill a guard had backed out of it. Then Skatzes blurted out, "Fuck the CO, I will kill the CO."

{¶ 141} On the morning of April 15 at another inmate-leader meeting, Skatzes got on the phone with prison negotiators and demanded that water and power be restored within L block or "there would be a guaranteed murder. Do your thing. 10:30 or a dead man's out there." The leadership voted to kill a guard, and a member of each inmate gang was chosen to participate in the killing. Skatzes agreed with the decision to kill a C.O. hostage.

{¶ 142} After Vallandingham was killed, Skatzes and other Aryans followed behind when the body was being carried out by masked inmates. Viewing this evidence in a light most favorable to the state, sufficient evidence supported Skatzes's conviction for the murder of Vallandingham.

{¶ 143} The evidence was sufficient for the jury to conclude that Skatzes actively participated in Vallandingham's kidnapping. Inmate Kenneth Hazlett, who stayed in L6, saw Skatzes and two other Aryans move Vallandingham to a different cell on the third day of the takeover. In our view, Skatzes's leadership role in the Aryan Brotherhood during the takeover and his control over the movement and treatment of C.O. hostages support his conviction for kidnapping Vallandingham. We reject proposition of law XXXIX.

{¶ 144} With respect to the murder of Sommers, several inmates testified that Sommers controlled the phones in L2 during negotiations and had made some bombs during the riot. Although Sommers stayed in the Aryan-controlled L2 during the riot, he was not a member of the Aryan Brotherhood. Moreover, Sommers had a reputation as a "snitch," an inmate who cooperated with prison authorities against other inmates.

{¶ 145} As the surrender was taking place at the end of the riot, Skatzes, Robb, Sanders, and Cummings told Lavelle that they had "some things [they had] to take care of." Skatzes, Snodgrass, and Bocook dressed in other clothes in L2, and when Robb showed up, they went to L7, across the hall from L2. Inmate Brookover also had a reputation as a snitch and was led to believe that he had a choice: kill someone or be killed. When Brookover asked Skatzes if he was going to be killed, Skatzes replied, "Just take care of business, be cool." Brookover was with the group that went into L7.

{¶ 146} When the group entered L7, no one else was there. Bocook yelled out, "Where's that bitch Sommers at." Robb lured Sommers into L7, and the group proceeded to beat him. Skatzes ran up, kicked Sommers in the head, and hit him in the head with a baseball bat—three times, according to Snodgrass. Brookover testified that Skatzes hit Sommers in the head as "[h]ard as you could hit." Other inmates also beat and stabbed Sommers. The killers, including Skatzes, then cleaned themselves and burned their clothes. The coroner testified that Sommers's skull had been "shattered" and that he died from a massive blow to the head. Based on the foregoing, a jury could have reasonably concluded that Skatzes murdered Sommers. The fact that others also stabbed and beat Sommers does not absolve Skatzes from culpability in his murder. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 69. We reject proposition of law XL.

{¶ 147} With regard to the kidnapping of C.O. Darrold Clark, there is no question that Clark and other corrections officers were held against their will at the direction of the leaders of the takeover. Skatzes was a leader of the Aryans during the takeover, and evidence established that he exercised control over the movement of the guard-hostages and their treatment. Clark testified that Skatzes would check on him and other hostages and that Skatzes got Clark moved out of the Muslim block when Clark requested it. This evidence was sufficient to sustain Skatzes's conviction for kidnapping Clark. We reject proposition of law XLI.

### Competency to Stand Trial

{¶ 148} In proposition of law XLV, Skatzes contends that he was incompetent to stand trial and essentially argues that the trial court erred in failing to conduct a competency hearing sua sponte. Skatzes submits the following evidence that he was incompetent:

{¶ 149} (1) he did not understand that he was waiving constitutional rights by taking the witness stand,

{¶ 150} (2) he did not understand the consequences of answering questions with speculative responses,

{¶ 151} (3) his use of colloquial phrases, such as "I reckon," subjected him to ridicule by the prosecutor,

{¶ 152} (4) he lost a significant amount of weight pending trial,

{¶ 153} (5) his mental state was deteriorating—inmates testified that his nickname was "Crazy George" and that he had exhibited paranoia throughout the takeover, and

{¶ 154} (6) he had been suffering from stress and confusion at the time of the takeover.

{¶ 155} It has long been recognized that "a person [who] lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103. "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, citing *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

{¶ 156} The defense didn't request a competency hearing before trial. R.C. 2945.37 provides that "[i]f the issue is raised after trial has begun, the court shall hold a hearing on the issue only for good cause shown." Thus, "the decision as to whether to hold a competency hearing once trial has commenced is in the court's discretion." *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401. The right to a hearing "rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry * * * is necessary to ensure the defendant's right to a fair trial." *Berry*, 72 Ohio St.3d at 359, 650 N.E.2d 433, citing *Drope*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103, and *Pate*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

{¶ 157} The record in this case does not reflect "sufficient indicia of incompetence" to have required the trial court to conduct a competency hearing. See *State v. Smith* (2000), 89 Ohio St.3d 323, 329, 731 N.E.2d 645. None of the points raised by Skatzes suggest that he did not understand the nature and objective of the proceedings against him or that he was unable to assist in his defense. Skatzes's decision to testify on his own behalf does not provide indicia of incompetence; he attempted to rebut the abundant testimony elicited against him. Nor do we find indicia of incompetence because Skatzes decided to exercise his constitutional rights. Neither his behavior at trial nor his testimony provides "good cause" or "sufficient indicia of incompetence." Deference on such issues should be granted to those "who see and hear what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

{¶ 158} Skatzes's alleged paranoia, stress, and confusion during the takeover do not indicate incompetence. Such reactions are understandable in the context of conditions during the takeover and do not appear to have impaired his ability to assist in his defense. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237. Moreover, at no time did defense counsel suggest that Skatzes lacked competence. See *State v. Were* (2002), 94 Ohio St.3d 173, 176, 761 N.E.2d 591 (counsel continually raised the issue of defendant's competency). Lead counsel represented Skatzes from his appointment in August 1994 through the January 1996 sentencing and thus had ample time to become familiar with Skatzes. If lead counsel had reason to question Skatzes's competence, he surely

would have raised the issue. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 411, 692 N.E.2d 151.

{¶ 159} We reject proposition of law XLV.

### Preservation of Evidence

{¶ 160} In proposition of law LIV, Skatzes contends that the trial court erred when it failed to keep control of the charts used by the prosecutors during voir dire to assist the state in explaining the capital trial process. The whereabouts of the charts are currently unknown. Skatzes does not make any specific argument regarding the contents of the charts; he simply asserts that he was entitled to a full record of the proceedings and that effective appellate review is impossible without the exhibits.

{¶ 161} In *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685, syllabus, we held: "The requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review." Although we dealt with bench and in-chambers conferences that were not transcribed in *Palmer*, the issue of missing exhibits not admitted into evidence is analogous.

{¶ 162} Skatzes's counsel made no attempt to make the prosecution's charts part of the record in the trial court, nor did counsel object to the prosecution's using the charts as a visual aid. As we noted in *Palmer*, if the off-the-record conferences had involved objections and requests considered crucial by the defense, the same objections and requests would certainly have been raised on the record. Id. at 556, 687 N.E.2d 685.

{¶ 163} Here, defense counsel made no attempt to recreate the contents of the charts pursuant to App.R. 9(C). As the court of appeals recognized, Skatzes failed to make the required showing of prejudice by identifying an infirmity in the charts. See App.R. 9. As we noted in *Palmer*, general averments of prejudice cannot substitute for an actual showing of prejudice. Id. at 555, 687 N.E.2d 685. We reject proposition of law LIV.

## SENTENCING ISSUES

### Jury Instructions

{¶ 164} In proposition of law XLII, Skatzes asserts ten instances of error during mitigation-phase jury instructions. Skatzes first contends that the trial court erred in instructing the jury that their sentencing verdict was a "recommendation." Use of the term "recommendation" accurately states Ohio law. We have rejected this argument in numerous cases. See, e.g., *Robb*, 88 Ohio St.3d at 84, 723 N.E.2d 1019.

{¶ 165} Skatzes argues that the trial court failed to count duplicative death specifications only once. Skatzes appears to argue that the trial court should have merged the specifications related to Skatzes's prior murder conviction and the present murder charges as a prisoner in a detention facility. The trial court, however, need not merge these specifications in the manner Skatzes suggests. See, e.g., *State v. Carter* (1992), 64 Ohio St.3d 218, 228, 594 N.E.2d 595; *State v. Bradley* (1989), 42 Ohio St.3d 136, 149, 538 N.E.2d 373.

{¶ 166} Skatzes complains that the trial court failed to merge or elect aggravated murder charges for the same victim before the jury deliberated. The trial court properly merged the counts at sentencing. R.C. 2941.25(A); *State v. Osborne* (1976), 49 Ohio St.2d 135, 144, 3 O.O.3d 79, 359 N.E.2d 78. No merger is required before the jury renders its sentencing verdict, and any error can be cured by our independent review. See *State v. Cook* (1992), 65 Ohio St.3d 516, 526–527, 605 N.E.2d 70.

{¶ 167} Skatzes contends that the trial court failed to merge duplicative death specifications before the jury deliberated. This argument is similar to those rejected above. Any error can be remedied by our independent review.

{¶ 168} Skatzes argues that the trial court double-counted the death specifications in its instructions to the jury and allowed the jury to weigh eight specifications for each murder victim. The trial court specifically instructed the jury that "[t]he death penalty for each individual count must be assessed separately. Only the aggravating circumstances relating to a given count may be considered in assessing the penalty for that count." A review of the court's instructions does not support Skatzes's assertion.

{¶ 169} Skatzes contends that the trial court failed to instruct the jury that mitigating factors need not be found unanimously. Skatzes, however, never requested such an instruction. Moreover, nothing in the record suggests that the jurors acted under such a misapprehension.

{¶ 170} Skatzes asserts that the trial court failed to define "principal offender," leaving the jury to rely on the erroneous "hands-on" killer definition given at the close of the trial phase. As we discussed under proposition of law XII, the evidence established that Skatzes was a principal offender in the murder of Sommers.

{¶ 171} Skatzes claims error in the court's instruction that the jury "not be influenced by any consideration of sympathy." Sympathy is not a proper factor for a jury to consider at sentencing. See, e.g., *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417–418, 613 N.E.2d 212.

{¶ 172} Skatzes asserts that the trial court erred in failing to instruct on all mitigating factors raised by the defense. The court did, however, instruct that

the jury could consider "any other factors that are relevant to the issue of whether the offender should be sentenced to death." The failure of the trial court to tailor instructions more to the evidence is neither required nor erroneous. See, e.g., *State v. Landrum* (1990), 53 Ohio St.3d 107, 122, 559 N.E.2d 710.

{¶ 173} Finally, Skatzes asserts error in the court's reasonable doubt instruction. The court's instruction was proper and did not include the "truth of the charge" language. See *State v. Moore* (1998), 81 Ohio St.3d 22, 37, 689 N.E.2d 1.

{¶ 174} Based on the foregoing, we reject proposition of law XLII.

### Sentencing Opinion

{¶ 175} In proposition of law LVI, Skatzes alleges that the trial court failed to conduct an appropriate sentencing evaluation. Skatzes contends that the court failed to explain why the aggravating circumstances outweigh the mitigating factors other than to say that all the evidence in mitigation was rejected.

{¶ 176} A trial court is not required to accept or assign weight to mitigating evidence. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. Even if the trial court failed to explain its weighing process, inadequate explanations do not create reversible error. *State v. Fox* (1994), 69 Ohio St.3d 183, 190, 631 N.E.2d 124. Moreover, any error in the trial court's sentencing opinion can be cured by our independent review. See, e.g., *State v. Raglin* (1998), 83 Ohio St.3d 253, 257, 699 N.E.2d 482. We reject proposition of law LVI.

### Alternate Jurors in Deliberation Room

{¶ 177} In proposition of law LV, Skatzes argues that the trial court erred in allowing alternate jurors in the deliberation room. He further asserts that defense counsel were ineffective for agreeing that alternates should be in the deliberation room during sentencing-phase deliberations.

{¶ 178} The trial court erred in allowing the alternate jurors to sit in on deliberations, even though defense counsel agreed to it and the trial court admonished the alternates to not participate in any way in the deliberations. As we held in *State v. Murphy* (2001), 91 Ohio St.3d 516, 531–534, 747 N.E.2d 765, and *State v. Jackson* (2001), 92 Ohio St.3d 436, 438–440, 751 N.E.2d 946, Crim.R. 24(F) prohibits the presence of alternate jurors in the jury deliberation room.

{¶ 179} Skatzes failed to object, however; therefore, all error is waived save plain error. *Murphy* at 532, 747 N.E.2d 765; *Jackson* at 438, 751 N.E.2d 946; *United States v. Olano* (1993), 507 U.S. 725, 739–741, 113 S.Ct. 1770, 123 L.Ed.2d 508. Cf. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 134. Skatzes does not allege, nor does the record reveal, that alternate jurors participated in the deliberations either " 'verbally, or through "body language;" or

because alternates' presence exerted a "chilling" effect on the regular jurors.' " Id. at ¶ 135, quoting *Olano*, 507 U.S. at 739, 113 S.Ct. 1770, 123 L.Ed.2d 508. Skatzes fails to demonstrate that he was prejudiced by the presence of the alternate jurors. See *Murphy*, 91 Ohio St.3d at 531–533, 747 N.E.2d 765; *Jackson*, 92 Ohio St.3d at 439–440, 751 N.E.2d 946. This court will not ordinarily presume prejudice. Id. at 439, 751 N.E.2d 946. In addition, defense counsel's decision to agree to allow alternates in the deliberation room did not amount to ineffective assistance because Skatzes did not and cannot demonstrate that he would have prevailed but for the error. We reject proposition of law LV.

### Execution of a Mentally Ill Person

{¶ 180} In proposition of law LX, Skatzes contends that the record establishes that he may suffer from a serious mental illness. Skatzes asserts that we should extend the decision in *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, prohibiting execution of mentally retarded persons, to those who suffer from serious mental illness. Nothing in the 6,000–plus pages of transcript and record establishes that Skatzes suffers from a serious mental illness. Skatzes has not presented any evidence bearing on his mental health. None of the assertions that Skatzes was "paranoid" or referred to as "Crazy George" create a genuine issue as to whether Skatzes has a mental illness that warrants consideration as part of his sentencing. We reject proposition of law LX.

## PROSECUTORIAL MISCONDUCT

{¶ 181} In propositions of law XXX and XLIII, Skatzes alleges that he was denied a fair trial because of prosecutorial misconduct throughout both phases of his trial. Determining whether remarks constitute prosecutorial misconduct requires analysis as to whether the remarks were improper, and if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749.

{¶ 182} In proposition of law XXX, Skatzes contends that the prosecution impermissibly vouched for the credibility of its witnesses in opening statements and throughout the trial. Skatzes did not object to most of the comments he cites, thereby waiving all but plain error. Although it is improper for an attorney to express his or her opinion or personal belief as to the credibility of a witness, a prosecutor may try to ensure that jurors would not be biased against his witness.

See *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 484, 653 N.E.2d 304.

{¶ 183} During opening statement at the outset of trial, the prosecutor told the jury that the state had difficulties gathering evidence in this case because of the length of the takeover, the number of inmates involved, the prison culture of not being a "snitch," and the lack of uncontaminated physical evidence recovered from the crime scene. The prosecutor mentioned that the state had been unable to identify the perpetrators of many of the offenses committed during the siege. The prosecutor then explained that in the investigation, deals were struck with some inmates to help the state piece together what had happened during the takeover. Skatzes contends that the prosecutor created the impression that he was vouching for the credibility of the state's witnesses. The state was entitled to present evidence regarding its methods of investigation following the riot and to refer to that evidence in opening statement. In addition, prosecutors can elicit or disclose information about plea agreements "to blunt or foreclose unfavorable cross-examination revealing that [witnesses] agreed to testify in exchange for favorable treatment by the prosecutor." *State v. Cornwell* (1999), 86 Ohio St.3d 560, 571, 715 N.E.2d 1144. The prosecutor's comments did not improperly vouch for the credibility of state witnesses.

{¶ 184} Skatzes contends that the prosecutor improperly vouched for the credibility of inmate witnesses through the testimony of Sgt. Hudson, who testified that he used a computer database to help "determine who was telling the truth or not." Hudson explained that the computer database was used to cross-reference information provided by a particular inmate on different occasions. Hudson testified about the need to make deals with some inmates in exchange for their testimony and about the special protection the state gave to cooperating inmates. The trial court sustained Skatzes's objection to Hudson's comment that making deals with inmates was necessary to "get the truth."

{¶ 185} Hudson testified as a "summary witness," who explained the process of the state's investigation of the riot and how it determined what charges to bring against certain inmates. His testimony does not appear to be improper vouching for the conclusions reached by the state's investigators. Given the complexity of investigating crimes committed during the takeover at SOCF, the state was entitled to explain the process that led to the filing of criminal charges against inmate suspects.

{¶ 186} Skatzes argues that the prosecutor improperly vouched for the testimony of inmate David "Doc" Lomache, by making it clear that Lomache had worked with the prosecutor in deciphering conversations on one of the tunnel tapes. The prosecutor elicited from Lomache that he and Lomache had worked together to decipher the tape. Lomache denied that he was coached by the prosecutor as to

what was on the tape. Evidence of cooperation does not constitute improper vouching for the witness's credibility.

{¶ 187} Finally, Skatzes asserts that the prosecutor improperly vouched for the credibility of inmates Brookover and Lavelle "by indicating that their plea bargains were guarantees of truthfulness." With regard to both of these witnesses, the inmates stated that their plea agreements required them to testify truthfully and that the plea agreements could be withdrawn if they failed to do so. In two instances where it did appear that the prosecutor was trying to bolster Brookover's testimony in this regard, the trial court sustained Skatzes's objections.

{¶ 188} As in *Cornwell,* the prosecutor's questions were not improper and did not prejudicially affect Skatzes's substantial rights. The questions cited were isolated, and when the prosecutor appeared to unduly emphasize truthful testimony by Brookover, the trial court sustained Skatzes's objections. Such questions should not be taken out of context or given their most damaging meaning. Id., 86 Ohio St.3d at 571, 715 N.E.2d 1144, citing *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431; and *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068. We reject proposition of law XXX.

{¶ 189} In proposition of law XLIII, Skatzes asserts misconduct by the prosecutor in arguing nonstatutory aggravating factors during mitigation-phase closing argument. Specifically, Skatzes claims that the prosecutor raised nonstatutory aggravating circumstances when the prosecutor stated that Skatzes "was one of the leaders, one of the people who controlled and ran the riot" and when the prosecutor remarked on Skatzes's membership in the Aryan Brotherhood. The prosecutor did not state that these were aggravating factors or circumstances, nor did he urge the jury to weigh them as aggravating circumstances. Cf. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 352–356, 662 N.E.2d 311. We reject proposition of law XLIII.

## EFFECTIVE ASSISTANCE OF COUNSEL

{¶ 190} In propositions XXXVII, XLVI, XLVII, XLVIII, XLIX, and L, Skatzes argues that trial counsel rendered ineffective assistance. Reversal of a conviction for ineffective assistance requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373. Skatzes does not demonstrate prejudice, "a reasonable probability that were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.

{¶ 191} In proposition of law XXXVII, Skatzes contends that defense counsel were deficient in failing to object to the state's repeated references to the Aryan Brotherhood and its beliefs. Skatzes relies on *Dawson v. Delaware* (1992), 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309, for the proposition that membership in the Aryan Brotherhood is not relevant evidence in a capital proceeding. *Dawson* has no application in this case because gang membership was not relevant to the crimes committed in *Dawson*. Here, as in *Robb*, the Aryan Brotherhood evidence was relevant because Skatzes used his status as an Aryan Brotherhood leader to commit the crimes he did, either personally or by complicity. See *Robb*, 88 Ohio St.3d at 88, 723 N.E.2d 1019. *Dawson* recognizes that gang membership and beliefs may be admissible when relevant. Id., 503 U.S. at 165, 112 S.Ct. 1093, 117 L.Ed.2d 309.

{¶ 192} Skatzes would not have been in a position to negotiate with authorities or to direct the actions of other inmates if not for his leadership role in the Aryan Brotherhood. This evidence was relevant and appropriate to explain Skatzes's actions during the takeover. Counsel were not deficient in failing to object to it. We reject proposition of law XXXVII.

{¶ 193} In proposition of law XLVI, Skatzes argues that counsel were ineffective in failing to investigate or present the defense of duress. The facts presented at trial, including Skatzes's own testimony, did not support the defense of duress. Skatzes claims that he was not involved in the deaths of Elder, Vallandingham, or Sommers. Although Skatzes admitted holding Clark as a hostage, he did not testify that he feared being harmed or killed if he had not done so. In order to assert a defense of duress, one must logically admit involvement in the crimes charged, but Skatzes denied involvement in the crimes he was charged with committing. In addition, this court will not infer a failure to investigate a defense by counsel from a silent record. See *Murphy*, 91 Ohio St.3d at 542, 747 N.E.2d 765.

{¶ 194} Counsel were not deficient for failing to raise duress as a mitigating factor. As set forth above, Skatzes denied involvement in the murders for which he was charged and convicted. In his unsworn statement, he denied involvement in any of the crimes of which he was convicted. Accordingly, raising duress as a mitigating factor would have contradicted Skatzes's own unsworn statement made during the mitigation phase. We reject proposition of law XLVI.

{¶ 195} In proposition of law XLVII, Skatzes asserts ineffective assistance in defense counsel's failure to challenge and pursue remedies for the defective indictment. As discussed under Skatzes's first five propositions of law, the information contained in the indictment was sufficient to inform Skatzes of the charges brought against him. Counsel requested and received a bill of particulars that allayed any perceived deficiencies in the indictment. Counsel were not

ineffective in failing to challenge the indictment. We reject proposition of law XLVII.

{¶ 196} In proposition of law XLVIII, Skatzes claims that counsel were ineffective in permitting Sgt. Hudson to testify on behalf of the state as a "summary witness." Yet counsel could have reasonably concluded that Skatzes had nothing to gain from having Hudson's testimony presented by several witnesses rather than one. Moreover, counsel had ample opportunity to cross-examine Hudson and did so. A review of Hudson's testimony indicates that he had firsthand knowledge of most of the matters about which he testified. In addition, Hudson's testimony did not directly implicate Skatzes in any of the crimes with which he was charged. Hudson testified that Skatzes was one of the primary inmate negotiators during the takeover, a fact not in dispute. Skatzes failed to demonstrate either deficient performance or prejudice in counsel's determination to permit Hudson's testimony in the manner it was presented. We reject proposition of law XLVIII.

{¶ 197} In proposition of law XLIX, Skatzes argues that counsel were ineffective in failing to object to the prosecutor's comments and to Sgt. Hudson's "vouching" for the state's case. As discussed under proposition of law XXX, the prosecutor's questions and the statements elicited during Hudson's testimony did not constitute improper vouching for the state's witnesses and evidence. Accordingly, counsel were not ineffective in failing to object to these statements. We reject proposition of law XLIX.

{¶ 198} In proposition of law L, Skatzes refers to numerous instances where defense counsel failed to object or act effectively throughout trial. We will discuss each in turn.

### Voir dire

{¶ 199} Skatzes asserts six instances of ineffective assistance by counsel during voir dire.

{¶ 200} Skatzes claims that counsel failed to object to the trial court's asking each prospective juror if he or she could vote for a death verdict but not mentioning a life verdict. The trial court's initial inquiry to each prospective juror appears to be a fair attempt to ascertain which were capable of sitting on a capital-murder-trial jury. There is no requirement for a trial court to "life qualify" prospective jurors absent a request by defense counsel. *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329, syllabus. Failure to do so does not constitute deficient performance.

{¶ 201} Skatzes claims that counsel failed to object to the prosecution's "instructing" the jury on the law during voir dire. The prosecution did not improperly instruct the jury when it explained the legal process of capital

offenses to prospective jurors. The prosecutor's explanations were balanced and accurate. Skatzes fails to demonstrate how he was prejudiced by such explanations.

{¶ 202} Skatzes claims that counsel failed to ask jurors to state their beliefs about the Aryan Brotherhood, but this did not constitute deficient performance. Trial counsel, who saw and heard the jurors, were in the best position to determine whether such voir dire was needed. *Bradley*, 42 Ohio St.3d at 143–144, 538 N.E.2d 373. Contrary to Skatzes's assertions, jurors who indicated pro-death penalty leanings in their questionnaires were adequately examined about their views during voir dire, including questions concerning the Aryan Brotherhood.

{¶ 203} Skatzes claims that counsel failed to challenge prospective juror Brooks. The record indicates that counsel challenged juror Brooks for cause. Moreover, Brooks was later excused when he indicated, before the jury was seated, that he could not sign a verdict.

{¶ 204} Skatzes claims that counsel failed to object to the state's example of mitigation using a hypothetical where two men committed multiple murders during a robbery of a store. The prosecution's hypothetical on what constitutes mitigation was not improper, nor were counsel deficient for not continuing to object to it. The statute, R.C. 2929.04(B), requires the jury to consider the nature and circumstances of the offense in mitigation, and the prosecutor's hypothetical example did not falsely characterize mitigation as Skatzes asserts.

{¶ 205} Finally, Skatzes claims that counsel failed to object to the prosecution's "instruction" that the jury's verdict had to be unanimous. Skatzes asserts that the prosecutor's response to a juror's question at voir dire violated the decision in *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030. Skatzes's trial, however, was finished approximately five months before *Brooks* was decided. Moreover, the prosecutor never implied that each mitigating factor had to be agreed upon unanimously to be considered in mitigation. In any event, the jurors were properly instructed on how they could consider factors in mitigation.

*Trial*

{¶ 206} Skatzes argues that counsel failed to object to jury instructions and other processes at trial. Skatzes cites nothing specific, however, and he admits that counsel did object to some instructions. Skatzes's bare assertions establish neither deficient performance nor prejudice.

{¶ 207} Skatzes claims that counsel were ineffective in failing to object to 49 instances of testimony from various witnesses on the grounds of relevancy. The vast majority of these instances are challenged under other propositions of law, and almost all of the evidence was properly admitted. Otherwise, any error was

harmless. Moreover, none of the alleged errors, either individually or collectively, was serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 208} Counsel were not ineffective for failing to object to the showing of television commentary during the presentation of State's Exhibit 5. This videotape contained the statement made by prison spokesperson Tess Unwin. Her statement had been cited by several inmate witnesses testifying that the inmates were upset because the statement showed that the state was not taking their demands seriously. Because this videotape was relevant, counsel were not ineffective for failing to object to it.

### Relevancy

{¶ 209} Skatzes next cites four instances where counsel failed to object to testimony and evidence that was irrelevant and should have been rejected under Evid.R. 403(A).

{¶ 210} Counsel failed to object to testimony about the selling of marijuana at SOCF and speculation as to who sold it. The failure to object to Brookover's testimony that he sold marijuana at the prison before the takeover did not implicate Skatzes in any way. The testimony likely undercut Brookover's credibility as a prosecution witness. The failure to object to this testimony was not deficient performance.

{¶ 211} Counsel failed to object to photographs admitted that were never connected to Skatzes. The "sheer number of photographs" introduced by the state—approximately 275 photos of L block after the takeover and over 400 inmate photos—did not prejudice Skatzes. Skatzes did not explain how they prejudiced him. See *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542. Moreover, in *Robb,* we noted that evidence relating to the "setting of the case" was relevant and admissible. *Robb,* 88 Ohio St.3d at 68, 723 N.E.2d 1019. The inmate photos allowed witnesses to identify participants in the takeover. Counsel were not ineffective in failing to object to the photographs.

{¶ 212} Counsel failed to object to the attempt to impeach defense witness Officer Ratcliff. Skatzes's argument that the state improperly explored a variety of objectionable issues (accounts of inmate conduct not attributable to Skatzes, use of a statement Ratcliff did not recall, and implications that Ratcliff suffered from Stockholm syndrome) is unpersuasive. The cross-examination of Ratcliff was not improper, nor was Skatzes prejudiced by it.

{¶ 213} Counsel failed to object to the admission of improper victim-impact evidence. Skatzes complains that references to Vallandingham's reputation, Clark's daughter, accounts of non-gang members' hunger, thirst, and fear, and

descriptions of murdered inmate Pop Svette were intended to elicit sympathy and bias and that counsel were ineffective in failing to object to such victim-impact testimony. This evidence was offered to establish the context of the takeover, not to show the victim's suffering, the family's grief, or the loss to the community caused by these crimes. See *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720. Counsel were not deficient in failing to object to it, in part, because the victims cannot be separated from the crimes. None of these failures to object constituted ineffective assistance.

### Other acts

{¶ 214} Skatzes argues that counsel were ineffective in failing to object to irrelevant evidence concerning the bad acts of others. Much of this evidence was properly admitted because it was relevant to the roles of the various gangs in the riot, to Skatzes's leadership role, and to the manner in which the gangs wielded their power. This evidence helped prove the conspiracy that occurred over the course of takeover. Moreover, because much of this evidence did not implicate Skatzes in these other crimes, he was not prejudiced by its admission, nor were counsel ineffective in failing to object to it.

### Hearsay

{¶ 215} Skatzes complains that counsel were ineffective for not objecting to numerous instances of hearsay testimony by Sgt. Hudson and the inmates' testifying on behalf of the state. As stated earlier, counsel were not ineffective in allowing Hudson to testify as a summary witness. Skatzes claims that it was plain error for the court to admit testimony about the killing or confinement of inmates disfavored by gang leaders, the attack on inmate Fryman, and a poem about the Aryan Brotherhood found in the cell of Aryan leader Freddie Snyder. Skatzes also complains of inmate opinions that Brookover was a snitch and what should be done with him and testimony by inmates Snodgrass, Hazlett, and Lomache that was never tied to Skatzes.

{¶ 216} Given the lack of evidence tying Skatzes to some of the incidents in question, defense counsel, in the exercise of their professional judgment, may have decided that the testimony was harmless or even helpful. A decision to object could have drawn undue attention to the testimony. Moreover, objections "tend to disrupt the flow of a trial" and "are considered technical and bothersome." *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339. The decisions by defense counsel not to interrupt appear to reflect "an objective standard of reasonable representation." *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. In any event, the outcome of Skatzes's trial would not have been different even if counsel had objected to the evidence cited by Skatzes. The jury could readily distinguish between evidence

that put the takeover in context and evidence that related to the crimes charged against Skatzes.

### Other alleged failures by counsel

{¶ 217} Skatzes claims that counsel were ineffective in failing to object to the admission of audio- and videotapes during trial. Skatzes asserts that the tapes were irrelevant and inflammatory. He further contends that the tunnel tapes were of poor quality and unreliable and were obtained in violation of R.C. 2933.52 et seq. We found the same audiotapes admissible in *Robb,* 88 Ohio St.3d 59, 723 N.E.2d 1019, and specifically rejected the argument that R.C. 2933.52 et seq. granted any privacy rights to rioting inmates in prison. Id. at 66–67, 723 N.E.2d 1019. Moreover, the audio- and videotapes portrayed important events during the riot as they unfolded at SOCF. Only portions of the tapes were played before the jury, and those portions gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042. Skatzes fails to demonstrate how these tapes were "inflammatory."

{¶ 218} Although the tunnel tapes were difficult to decipher, Skatzes was free to highlight their shortcomings on cross-examination. Skatzes's argument goes to the weight of the evidence rather than its admissibility. Because the tapes were admissible, counsel were not ineffective in failing to object to them.

{¶ 219} Skatzes argues that counsel were ineffective in failing to prepare him to testify on his own behalf. His testimony differed greatly from the state's portrayal of what occurred during the riot and promoted the defense argument that Skatzes was a "peacemaker" during the siege. Even though many of Skatzes's answers to questions were long-winded or rambling, this did not prejudice him. The fact that the jury did not believe his version of what happened during the takeover does not mean that counsel were ineffective in presenting Skatzes's testimony at trial.

{¶ 220} Finally, Skatzes claims ineffective assistance in counsel's failure to object to jury instructions, the presence of alternates in the jury deliberation room, and in failing to bring Skatzes's severe mental illness to the attention of the trial court.

{¶ 221} With regard to the jury instructions, Skatzes cites *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, and contends that counsel failed to take steps to prevent the violation of his right to a sentencing jury "that was fully cognizant of the full weight of its responsibility." Under R.C. 2929.03(D)(2), the jury determines whether a death specification has been proven beyond a reasonable doubt, and this requirement does not run afoul of what *Ring* requires. As we noted in a recent case, *Ring* is not applicable to Ohio's capital

sentencing scheme. See *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 69–70.

{¶ 222} With regard to the presence of alternates in the deliberation room, as discussed under proposition of law LV, counsel were not ineffective for allowing the alternates to sit in during deliberations nor was Skatzes prejudiced by their presence.

{¶ 223} Counsel were not ineffective in not bringing Skatzes's alleged mental illness to the attention of the trial court. As discussed under proposition of law LX, the record does not establish that Skatzes suffers from severe mental illness. Counsel represented Skatzes for many months and became quite familiar with him and most certainly would have raised the issue if any mental illness were present or apparent.

{¶ 224} We reject proposition of law L.

## CONSTITUTIONALITY

{¶ 225} In proposition of law LII, Skatzes challenges Ohio's death-penalty statutes on numerous constitutional grounds; as we have before, we summarily reject these claims. See, e.g., *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, syllabus; *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972; *State v. Esparza* (1988), 39 Ohio St.3d 8, 529 N.E.2d 192; *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701; *Maurer*, 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768; *State v. Coleman* (1989), 45 Ohio St.3d 298, 544 N.E.2d 622; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

### Court of Appeals Issues

{¶ 226} In proposition of law LVIII, Skatzes asserts that several issues concerning the record on appeal were not resolved satisfactorily. Most of these issues involve substitute exhibits accepted by the court of appeals in its review of Skatzes's appeal. The court of appeals delayed review of this case for approximately six years in order to obtain a complete record. Exhibits from Skatzes's trial had been removed from the record in this case and used at other trials involving crimes committed during the April 1993 takeover at SOCF. The court of appeals did an admirable job in locating missing exhibits and obtaining duplicate copies of some exhibits. As the court of appeals noted in its opinion: "We are confident that, with the exception of the coroner's sketches, we have been able to supplement the record with true and accurate copies of the exhibits admitted at trial * * * and Skatzes has not advanced a credible argument as to how he was prejudiced by those sketches." *State v. Skatzes*, Montgomery App. No. 15848, 2003-Ohio-516, 2003 WL 490549, at ¶ 447. Moreover, the trial record

need not be "perfect" for purposes of appellate review. *State v. Palmer*, 80 Ohio St.3d 543, 687 N.E.2d 685, syllabus. We reject proposition of law LVIII.

{¶ 227} In proposition of law LIX, Skatzes asserts that the court of appeals erred in allowing the state to supplement the record with written jury instructions that conflicted with the certified transcript and were not properly authenticated. As discussed under proposition of law IX, however, the instruction found in the trial transcript was totally illogical and would have required the jury to find Skatzes culpable only if his acts in furtherance of the conspiracy took place *before* his involvement in the conspiracy. Moreover, the trial court directed the jurors not to take notes during jury instructions because they would have a copy of the instructions in the deliberation room.

{¶ 228} The court of appeals obtained the written instructions issued by the trial court that were placed in the jury's deliberation room. It did not err in supplementing the record with the written jury instructions that the trial court essentially encouraged the jury to rely on during deliberations. We reject proposition of law LIX.

## INDEPENDENT REVIEW AND PROPORTIONALITY

### *Aggravating Circumstances*

{¶ 229} Upon independent assessment, the evidence proves beyond a reasonable doubt the aggravating circumstances in this case:

{¶ 230} (1) Skatzes was complicit in the murders of Robert Vallandingham and Earl Elder,

{¶ 231} (2) Skatzes was a principal offender in the murder of David Sommers while imprisoned in a detention facility [R.C. 2929.04(A)(4) ],

{¶ 232} (3) Skatzes was a principal offender in the murder of David Sommers as a course of conduct,

{¶ 233} (4) Skatzes was a principal offender in the murder of David Sommers and had a prior aggravated murder conviction [R.C. 2929.04(A)(5) ], and

{¶ 234} (5) Skatzes was a principal offender in the murder of David Sommers in connection with aggravated kidnapping [R.C. 2929.04(A)(7) ].

### *Mitigating Evidence*

{¶ 235} At the mitigation hearing, Skatzes presented five witnesses. John Powers, an African–American inmate at SOCF, described Skatzes as a "regular guy, he was like just a straight dude." He stated that Skatzes was different from other Aryans and was not a racist, and that they respected each other. Powers asserted that Skatzes was "a peacemaker" in prison who had the respect of the prison guards and inmates before the takeover. Powers further testified that

during the takeover, Skatzes was helpful to the hostage prison guards and did not want them to die.

{¶ 236} Dwayne Johnson, another African–American inmate at SOCF, testified that Skatzes treated him fairly and that Skatzes treated everybody "with utmost respect." According to Johnson, Skatzes was different from most Aryans. He recalled that Skatzes at one time quelled a potential race war in Ohio Prison Industries. Skatzes was also helpful to injured prison C.O.s during the riot. Johnson described Skatzes as "a pretty likable guy" and feels that Skatzes would be a positive influence on inmates if he were returned to Lucasville.

{¶ 237} A third African–American inmate at Lucasville, Wendell Drake, echoed the testimony of the first two mitigation witnesses that Skatzes respected people of all races. Skatzes was at the forefront of the program "Juveniles to Avoid Institutional Lockup," a "scared straight" type of program to help counsel juvenile delinquents. Drake stated that Skatzes tried to stabilize things during the takeover and would check on the well-being of inmates. Drake felt that Skatzes helped keep the violence to a minimum during the takeover because people respected him. Drake further expressed his belief that Skatzes could do a whole lot of good because there is a lot of good in his heart.

{¶ 238} Lucasville inmate Charles Schweingrouber considers Skatzes "a very good friend" of his. He believes that Skatzes could have a positive influence on younger inmates and views Skatzes as a person who always tries to help people and does not lie. According to Schweingrouber, prison guard Jeff Ratcliff would have been in "serious trouble" during the takeover if not for Skatzes's protecting him. During the takeover, Skatzes would walk around, see how everyone was doing, and ensure that everybody had adequate food, water, and medical attention.

{¶ 239} SOCF Corrections Officer Jeff Ratcliff testified that Skatzes was an example to younger inmates and helpful to the C.O.s. Ratcliff credits Skatzes with saving his life during the takeover and claims he was helpful in trying to calm down C.O. Darrold Clark during the takeover. He testified that Skatzes was removed from the inmate-negotiating team because he relayed a message to Ratcliff's parents during his radio address.

{¶ 240} Skatzes gave a lengthy unsworn statement in which he stated that he disagreed with the jury's guilty verdict but accepted it. He claimed that the witnesses testifying against him were lying and asserted that he would have faced reduced charges for his actions during the takeover if he had snitched on other inmates. Skatzes professed to be "a firm believer in the man upstairs" but that he did not want to "beg somebody else for my life." He denied being involved in a gang and claimed that he never voted "for that man to be killed, or none of

that." Based on the evidence, Skatzes stated, "I don't see how anybody could justify giving me the death penalty with this kind of evidence coming in here."

*Sentence Evaluation*

{¶ 241} The nature and circumstances of the offenses offer nothing in mitigation. Skatzes was a leader in the Aryan Brotherhood during the takeover and exercised his power to help determine who should live and who should die during the takeover. As a member of the inmate-negotiating team, Skatzes repeatedly threatened to kill a prison guard-hostage if certain inmate demands were not met. He threatened that a C.O. would be killed if the water and power were not restored to L block. Robert Vallandingham was murdered when the demand was not met by the deadline Skatzes had mentioned. Skatzes was complicit in the murder of inmate Earl Elder and counseled a younger inmate to "take this guy out." Skatzes was a principal offender in the murder of inmate David Sommers and kicked Sommers in the head and beat him on the head with a baseball bat.

{¶ 242} Skatzes's history, character, and background offer little in mitigation. He was in prison for committing another murder and was firmly immersed in prison culture. Even so, several witnesses opined that Skatzes was a respectful person, a good example to younger inmates, and not a racist.

{¶ 243} With respect to the statutory mitigating factors of R.C. 2929.04(B), factor (6) is applicable with regard to the murder of Elder because Skatzes's guilt in that murder was by complicity, not as a principal offender. In view of Skatzes's prominent role in counseling an inmate to kill Elder, this factor is entitled to very little weight in mitigation. See, e.g., *State v. Issa* (2001), 93 Ohio St.3d 49, 71, 752 N.E.2d 904.

{¶ 244} As to "other factors," R.C. 2929.04(B)(7), Skatzes's belief in "the man upstairs" and his work with juvenile offenders in a prison-sponsored program are worthy of some weight in mitigation. Skatzes's role in saving the life of C.O.-hostage Jeff Ratcliff is entitled to some weight in mitigation.

{¶ 245} Nevertheless, we find that the aggravating circumstances as to the murder of Elder, the murder of Vallandingham, and the murder of Sommers outweigh the mitigating factors beyond a reasonable doubt. Skatzes was a leader in the takeover at SOCF and wielded that power to kill inmate snitches or potential snitches. His claims that he was a peacemaker during the takeover and that he was not involved in the killings of which he is accused lack credibility in light of the evidence.

{¶ 246} We further find that the death penalty in this case is both appropriate and proportionate when compared with the death sentences imposed in the other Lucasville cases decided by this court. See *Sanders*, 92 Ohio St.3d 245, 750 N.E.2d 90; *Robb*, 88 Ohio St.3d 59, 723 N.E.2d 1019; and *State v. LaMar*, 95

Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166. It is also proportionate to death sentences approved for aggravated murders in detention facilities, see *State v. Stojetz,* 84 Ohio St.3d 452, 705 N.E.2d 329; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; and for aggravated murder with a prior murder conviction, see *State v. Spirko* (1991), 59 Ohio St.3d 1, 570 N.E.2d 229; *State v. Taylor* (1997), 78 Ohio St.3d 15, 676 N.E.2d 82. It is also proportionate to death sentences approved for aggravated murders during kidnappings, see *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245; *State v. Nields* (2001), 93 Ohio St.3d 6, 752 N.E.2d 859; and for aggravated murders as a course of conduct involving the purposeful killing or attempt to kill two or more persons, see *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506; *State v. Jordan,* 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1; and *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637.

{¶ 247} We affirm the judgment of the court of appeals.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

Mark E. Piepmeier, Special Prosecuting Attorney, and William E. Breyer, Assistant Special Prosecuting Attorney, for appellee.

S. Adele Shank and Gary W. Crim, for appellant.