[Cite as *State v. Wilkins*, 2012-Ohio-459.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.      25626 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| KENNETH R. WILKINS, JR. | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.     CR 10 01 0064 |

DECISION AND JOURNAL ENTRY

Dated: February 8, 2012

BELFANCE, Presiding Judge.

{¶1}    Kenneth Wilkins appeals his convictions for complicity to commit aggravated robbery and complicity to commit murder.  For the reasons set forth below, we affirm.

I.

{¶2}    Darrington Griffin sold drugs from an apartment he shared with his girlfriend Amanda Foster and their son.  On December 19, 2009, Mr. Wilkins and an unidentified man came to the apartment looking for drugs.  While Ms. Foster sat on the couch talking on her cellphone, Mr. Wilkins stood by the threshold of the kitchen, and Mr. Griffin went into the kitchen with the third man.

{¶3}    Ms. Foster heard a gunshot.  Mr. Griffin stumbled into the living room from the kitchen and collapsed to the floor.  The shooter emerged from the kitchen holding a gun and told Ms. Foster to get on the ground.  After Ms. Foster obeyed the man's command to get on the ground, Mr. Wilkins left with the shooter.

**{¶4}** The police arrested Mr. Wilkins on January 5, 2010, and he was indicted for complicity to commit aggravated robbery, complicity to commit aggravated murder, and theft, as well as two gun specifications for the complicity charges. Following a Crim.R. 29 motion at the close of the State's case, the trial court dismissed the theft charge, but the jury convicted Mr. Wilkins of complicity to commit aggravated robbery and complicity to commit murder, a lesser-included offense of complicity to commit aggravated murder. The trial court sentenced Mr. Wilkins to an aggregate term of 18 years to life.

**{¶5}** Mr. Wilkins has appealed, raising two assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED PLAIN ERROR IN ITS INSTRUCTION TO THE JURY ON COMPLICITY, BY FAILING TO SPECIFY ANY MENS REA ELEMENT.

**{¶6}** Mr. Wilkins argues that the trial court committed plain error when it instructed the jury on complicity. We disagree.

**{¶7}** Mr. Wilkins did not object to the trial court's jury instructions and, as a result, he forfeited all but plain error on appeal. *See State v. Smallwood*, 9th Dist. No. 24282, 2009-Ohio-1987, ¶ 11. *See also* Crim.R. 52(B).

**{¶8}** Generally, to establish plain error,

there must [first] be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[]' [to the extent that it] * * * affected the outcome of the trial.

*State v. Hardges*, 9th Dist. No. 24175, 2008–Ohio–5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

**{¶9}** A trial court's jury instructions must be correct and complete statements of the law. *State v. Franklin*, 9th Dist. No. 22771, 2006-Ohio-4569, ¶ 9, citing *Marshall v. Gibson*, 19 Ohio St.3d 10, 12 (1985).

> [A]n appellate court reviews the instructions as a whole. If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party.

*State v. Horne*, 9th Dist. No. 24672, 2010-Ohio-350, ¶ 19, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993).

**{¶10}** Mr. Wilkins was indicted under R.C. 2923.03(A)(2), which provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" In *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, the Supreme Court of Ohio considered the following instruction: "'Before you can find the defendant guilty, you must find beyond a reasonable doubt that * * * the defendant, acting with the required culpable mental state for the particular offense, * * * conspired with another to commit the offenses.'" *Id.* at ¶ 58. The Supreme Court concluded that the instruction did not constitute plain error because the "jurors would have understood this instruction to mean that they should apply the culpable mental state for the offense that they found to be the object of the conspiracy." *Id.*

**{¶11}** Similarly, in this case, the trial court instructed the jury that, in order to be convicted of complicity, "[a] [d]efendant must act with the same culpable mental state as the principal offender for each charge in the indictment." This instruction properly instructs the jury on culpable mental state required by R.C. 2923.03(A)(2), and Mr. Wilkins has not argued that

the trial court erred in its instructions for aggravated robbery, aggravated murder, or murder. Although Mr. Wilkins also suggests in his merit brief that the trial court erred in failing to specify any mens rea for the alleged act of complicity itself, namely, whether Mr. Wilkins "knowingly, recklessly or negligently aided or abetted the principal in the commission of these crimes[,]" he has failed to provide any legal authority for this proposition. Accordingly, Mr. Wilkins has not demonstrated that the trial court committed plain error. *See Skatzes* at ¶ 58.

**{¶12}** His first assignment of error is overruled.

ASSIGNMENT OF ERROR II

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE.

**{¶13}** Mr. Wilkins argues that his convictions were against the manifest weight of the evidence because the jury should not have believed the testimony of Adam Stark, a jailhouse informant, and because the jury should have believed Mr. Wilkins' testimony over the testimony of Ms. Foster due to her being in shock at the time of the shooting. We disagree.

**{¶14}** In reviewing a challenge to the weight of the evidence, the appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

**{¶15}** Though Mr. Wilkins was convicted for complicity to commit aggravated robbery and complicity to commit murder, he does not argue that the underlying offenses of aggravated robbery and murder did not occur. Instead, he confines his arguments to whether the jury's determination that he aided or abetted the shooter was against the manifest weight of the

evidence. *See* R.C. 2923.03(A)(2) ("No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]")

{¶16} In order to support a conviction for violating R.C. 2923.03(A)(2) by aiding and abetting,

> the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus.

{¶17} Ms. Foster testified that, on the night Mr. Griffin was shot, Mr. Wilkins came to the front door and Mr. Griffin let him into the apartment. Ms. Foster sat on the couch watching television while the two men went into the kitchen. After a couple of minutes, Mr. Wilkins left, and Mr. Griffin sat on the couch with Ms. Foster. After Mr. Wilkins left, Ms. Foster called a friend on her cellphone.

{¶18} According to Ms. Foster, while she was sitting on the couch and talking on the phone, there was a knock on the door. Mr. Griffin answered the door, and Mr. Wilkins entered the apartment with another man. The three men went into the kitchen, and, approximately a minute later, Ms. Foster heard a gunshot. Ms. Foster testified that, within seconds of the gunshot and before she could stand up from the couch, Mr. Wilkins had taken her phone and hung it up.

{¶19} Ms. Foster testified that, after Mr. Wilkins took her phone, she saw Mr. Griffin stumble out of the kitchen and fall to the floor. However, before she could check on him, the third man emerged from the kitchen, pointed a gun at her, and told her to get on the floor, which she did. According to Ms. Foster, one of the men said, "[C]ome on, let's go[,]" and both men left out the back door.

{¶20} Officer Vincent Tassiello of the Akron Police Department was dispatched with his partner to the scene of Mr. Griffin's shooting. Officer Tassiello testified that they arrived on the scene and approached Mr. Griffin's apartment from the rear entrance. According to Officer Tassiello, Ms. Foster told them that Mr. Wilkins and the shooter had exited out the back door, and, based on this information, Officer Tassiello went outside to look for footprints in the snow. He discovered two sets of footprints "overlapping or on top of each other [as] if they were running one in front of the other." According to Officer Tassiello, one set of prints "started out * * * about 10 to 15 feet wider than the other one, and then kind of turned and came back and caught up with [the first set] * * * and then continued." These footprints appeared to be "fresh" because, even though snow was falling that night, it had not covered the footprints.

{¶21} Officer Michael Rinn corroborated Officer Tassiello's assessment that the footprints appeared fresh. He testified that he arrived on the scene and took pictures of the footprints and noticed that the footprints went around the side of Mr. Griffin's apartment and ended next to some tire tracks.

{¶22} Mr. Stark was an inmate at the Summit County Jail while Mr. Wilkins was held there awaiting trial. According to Mr. Stark, he met Mr. Wilkins through a mutual acquaintance. Mr. Stark testified that he spoke with Mr. Wilkins a couple of times. According to Mr. Stark, Mr. Wilkins eventually told him that Mr. Wilkins and another man had come with a plan to rob Mr. Griffin in a way that would make it appear as though Mr. Wilkins had no part in the robbery. Mr. Stark said that Mr. Wilkins described a plan that involved three men: Mr. Wilkins, the shooter, and the man who had come up with the plan.

{¶23} Mr. Stark testified that Mr. Wilkins told him that the shooter and Mr. Griffin went into the kitchen while Mr. Wilkins stayed in the living room with Ms. Foster. When the shooter

shot Mr. Griffin, the shooter ordered Mr. Wilkins and Ms. Foster to the ground and then the shooter and Mr. Wilkins left together. According to Mr. Stark, Mr. Wilkins claimed that the shooter went one way and he went another. Mr. Wilkins and the shooter later met up to split the money from the robbery.

{¶24} Mr. Wilkins' testimony differed from that of Ms. Foster and Mr. Stark. According to Mr. Wilkins, he went to Mr. Griffin's apartment three different times the day Mr. Griffin was shot: once in the middle of the afternoon when Ms. Foster was not present, once at around nine o'clock in the evening to purchase marijuana, and then a third time shortly after that. Mr. Wilkins testified that, the third time he was inside Mr. Griffin's apartment, he was speaking to Mr. Griffin near the front door when another man arrived. The other man told Mr. Griffin that he wanted to buy some marijuana.

{¶25} According to Mr. Wilkins, Mr. Griffin told him to wait while Mr. Griffin and the other man went into the kitchen. Mr. Wilkins testified that he attempted to talk to Ms. Foster while the men were in the kitchen, but she was not paying attention to him. When Mr. Wilkins heard the gunshot, he ran towards the front door, stopping when he heard the shooter say, "[G]et on the ground." Mr. Wilkins testified that, before he could get on the ground, however, the shooter ordered him to take Ms. Foster's cellphone, which he did. Mr. Wilkins testified that he tossed Ms. Foster's phone to the shooter and then the shooter ordered him to go through Mr. Griffin's pockets. After Mr. Wilkins did so, the shooter made him go out the back door.

{¶26} Mr. Wilkins also testified that he never had the conversations with Mr. Stark that Mr. Stark had claimed. According to Mr. Wilkins, Mr. Stark approached him and started asking him questions about his case. Mr. Wilkins also testified that papers related to his case were

taken from his case file he kept in his cell and that Mr. Stark, because of his position on the cleanup crew, would have had access to Mr. Wilkins' cell when Mr. Wilkins was not present.

{¶27}  Mr. Wilkins argues that Ms. Foster was clearly traumatized by the shooting and, therefore, her testimony should be accepted with caution.  However, they both testified that Mr. Wilkins came to the apartment twice within a short time.  However, Ms. Foster testified that Mr. Wilkins arrived with the shooter while Mr. Wilkins testified that the shooter came later.  Ms. Foster and Mr. Wilkins both testified that he took Ms. Foster's phone, but Ms. Foster testified that he took it immediately while Mr. Wilkins testified that he did so only after Ms. Foster was lying on the floor and after being ordered to do so by the shooter.  They also testified that Mr. Wilkins left with the shooter, though Mr. Wilkins testified that he left with the shooter because the shooter made him.

{¶28}  The jury's decision to believe Ms. Foster's version of events over Mr. Wilkins' version was reasonable, especially given the testimony of Officers Tassiello and Rinn.  Officer Tassiello testified that he observed two sets of fresh footprints in the snow and that it appeared as though they were running together.  Officer Rinn testified that the two footprints ended at a tire track, which would allow the jury to make the reasonable inference that whoever made the tracks got into a vehicle together.

{¶29}  Furthermore, even when Mr. Wilkins testified that the shooter had forced him to leave with him, Mr. Wilkins admitted that he never attempted to call for help after the shooter let him go.  This was despite his claims of being friends with Mr. Griffin and despite knowing that the shooter had taken Ms. Foster's phone.  Mr. Wilkins testified that he did not contact the police because he was afraid of being charged with violating his probation, an explanation the jury was not required to believe.

**{¶30}** Mr. Stark's testimony, if believed, also supports the finding that Mr. Wilkins aided and abetted the shooter in robbing and killing Mr. Griffin. Mr. Wilkins argues that Mr. Stark lacks credibility because he is a jailhouse informant. However, Mr. Wilkins' trial counsel ensured that the jury was aware of Mr. Stark's potential ulterior motives, namely that he hoped to curry favor with the police and the prosecution and, thus, be given leniency in his own pending charges. Mr. Wilkins' attorney also thoroughly cross-examined Mr. Stark on his crimes, his criminal history, and his history as an informant. Thus, to the extent that the jury believed Mr. Stark's testimony, it did so with knowledge of his potential credibility issues.

**{¶31}** After a thorough review of the record, we cannot say the jury lost its way when it found Mr. Wilkins guilty of complicity to commit aggravated robbery and complicity to commit murder. Accordingly, Mr. Wilkins' convictions are not against the manifest weight of the evidence.

**{¶32}** His second assignment of error is overruled.

III.

**{¶33}** Mr. Wilkins' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
DICKINSON, J.
CONCUR

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.